

Judy Mencher, Goodwin, Procter & Hoar, Boston, Mass., for John C. Turner, alleged debtor.

George W. Mykulak, Goldstein & Manello, Boston, Mass., for petitioning creditors.

Kitt Sawitsky, Goulston & Storrs, Boston, Mass., for Federal Distillers petitioning creditor.

Charles L. Glerum, Choate, Hall & Stewart, Boston, Mass., for petitioning creditors Whitehall Company, Ltd., Crown Distributors, Inc.

**In re John C. TURNER, Alleged Debtor.**

**Bankruptcy No. 82–00930L.**

United States Bankruptcy Court, D. Massachusetts.

Dec. 9, 1987.

Jennifer R. Seton, Nutter, McClennen & Fish, Boston, Mass., for petitioning creditor August A. Busch & Co. of Mass.

OPINION

JAMES F. QUEENAN, Jr., Bankruptcy Judge.

This case presents the question, in an unusual factual and legal setting, of whether an alleged debtor in a dismissed involuntary Chapter 7 petition is entitled to recover damages against the petitioning creditors on the ground that they filed the petition in bad faith. A primary issue involved is the extent to which protection is afforded by the opinion of counsel to the petitioning creditors that the petition had merit. Seven wholesale distributors of alcoholic beverages (the "petitioners")[1] filed a petition

---

1. Boston Beverage Corp., August A. Busch & Company of Massachusetts, Inc., M.S. Walker, Inc., Federal Distillers, Inc., Whitehall Company, Ltd., Crown Distributors, Inc., and Burke Distributing Corp.

against John C. Turner ("Turner") requesting that an order for relief be entered under Chapter 7 (11 U.S.C. §§ 701 *et seq.*), which requires liquidation of a debtor's non-exempt property for the purpose of paying his creditors. The petition alleged, *inter alia,* that the petitioners held claims totaling almost $900,000 which were not contingent as to liability, that the claims were based upon sums due from the sales of beverages to various specified corporations owned and controlled by Turner, that Turner "has, in his dealings with petitioners, consistently ignored the corporate distinction of such entities," and that Turner was not paying his debts as they became due. Turner denied the allegations and counterclaimed for damages under 11 U.S.C. § 303(i),[2] alleging that the petition was filed in bad faith.[3]

The number of court proceedings which have already been generated by the controversy over the very filing of this case hardly present a paradigm of speedy justice. The case was filed on May 24, 1982. Its filing has been the subject of five separate proceedings before other judges of this court, plus one decision by the district court on appeal. It has been previously decided by this court that:

(1) Turner is entitled to summary judgment on the question of whether the petitioners hold claims that are contingent as to liability, except for their claims on some bad corporate checks;

(2) As to those checks, certain of the petitioners held claims that were not contingent as to liability, so that they had standing to bring the petition;

(3) The petition should be dismissed because it is governed by the 1984 amendment to § 303 which expressly precluded debts subject to a *bona fide* dispute from being considered on the question of whether a debtor is generally not paying his debts as they become due (affirmed on appeal);

(4) Turner is not entitled to costs or a reasonable attorney's fee under § 303(i)(1), which does not require a showing of bad faith.

(5) A mistrial should be declared in a prior trial of the counterclaim now before the Court, when another judge recused himself in the midst of the trial upon discovering that a partner in the law firm with whom his law clerk had accepted employment was a major witness in the case.

After Turner had completed his evidence in the present proceeding, the petitioners moved under Bankr.R. 7041(b), asking for dismissal of the counterclaim on the ground that, on the facts and the law, Turner has shown no right to relief, and requesting the Court as the trier of fact to find that the petition was not filed in bad faith. That motion has been granted by separate judgment. We set forth here our findings of fact and rulings of law in support of the judgment, pursuant to Bankr.R. 7041(b) and 7052.

---

**2.** Section 303(i) (before the 1986 amendments) reads as follows:

If the court dismisses a petition under this section other than on consent of all petitioners and the debtor, and if the debtor does not waive the right to judgment under this subsection, the court may grant judgment—

(1) against the petitioners and in favor of the debtor for—

(A) costs;

(B) a reasonable attorney's fee; or

(C) any damages proximately caused by the taking of possession of the debtor's property by a trustee appointed under subsection (g) of this section or section 1104 of this title; or

(2) against any petitioner that filed the petition in bad faith, for—

(A) any damages proximately caused by such filing; or

(B) punitive damages.

**3.** The Court has previously dismissed, or disallowed as proposed amendments, counts in the counterclaim which were based upon allegedly false affidavits filed long after the petition (Counts II and III), actions of the petitioners taken after the petition filing date which were allegedly intended to drive Turner from the liquor business (Count IV), intentional interference with advantageous business relationships (Count V), and lack of standing of two of the petitioners (Count VI). We are therefore left with Count I, the only Count that is framed to state a claim for a bad faith filing under § 303(i).

## I. PRINCIPAL FINDINGS OF FACT

We first outline Turner's business operations, confining ourselves to those circumstances that were known to the petitioners and their counsel at the time of the filing. Turner was an officer, director and sole stockholder of record in three corporations, each of which operated a so-called "package" store selling at retail liquor, beer and wine: Turner's Package Store, Inc.; Thrifty Liquors, Inc.; and Medford Thrifty Liquors, Inc. He exercised general supervisory control over all three corporations. He also exercised general supervisory control over, but held no office or stock of record in, four other corporations, each of which owned a package store: Boston Thrifty Liquors, Inc.; John F. McCarthy, Inc.; Allied Beverage Corp.; and Diversified Liquors, Inc. He supervised the management of all seven of these corporations (the "Corporations") from one central location, which at the time of the petition filing was at 19 McGrath Highway, Somerville, Massachusetts. Purchasing for the Corporations was combined in order to obtain volume discounts from the petitioners and other wholesalers. Turner supervised these purchases and their payment. He was the principal person with whom the petitioners dealt in their transactions with all seven Corporations.

During the months preceding the filing, some of the Corporations were posted on the so-called sixty day list by the Alcoholic Beverage Control Commission of Massachusetts, (the ABCC), pursuant to Mass. Gen.L. ch. 138, § 25. The stores were put on the list because they were more than sixty days delinquent in paying their bills to wholesalers. During the time a store is posted on this ABCC list, it must pay for deliveries C.O.D. Others of the Corporations not on the list would then purchase liquor, beer and wine for the listed stores; upon receiving delivery, they would ship the purchases to those on the list.

Under Mass.Gen.L. ch. 138, § 15, no person may own, directly or indirectly, licenses for the sale of all alcoholic beverages at more than three locations. Because of Turner's dealings with the petitioners on behalf of all of the Corporations, and in light of this statute, the petitioners had reasonable grounds to believe that Turner was the beneficial owner of all of the Corporations. We expressly make no objective finding on this point, however, except as to the three Corporations in which he held a record ownership interest. At the trial, Turner testified that various individuals, including his brother, owned the other four Corporations. He also introduced at the trial a document indicating, and we so find, that the ABCC had approved a cooperative buying program among the seven Corporations. The petitioners, however, knew nothing about this program.

The package store business was highly competitive in the Boston area. The Corporations began experiencing severe financial difficulties in late 1981. Turner, as a representative of all seven Corporations, met with several of the petitioners to discuss the growing debt problem. He assured them that he was determined to see the problem through and that their debt would be paid. He said to them in words or substance: "I will see that your debt is paid in full." At no time, then or later, did he say anything to them that could reasonably be interpreted as a personal guaranty of the debt. A few of the petitioners requested that he personally guaranty their debt in writing, and he refused.

The Corporations' difficulties increased. In February of 1982, United Liquors, Inc. ("United"), a large supplier not involved in this petition, brought suit against Turner in state court alleging that he was personally liable for the Corporations' purchases from United. Without prior notice to Turner, United obtained *ex parte* court orders approving attachments of $225,000 upon Turner's homes in Sudbury and Duxbury; these orders were dated, respectively, February 24, 1982 and May 17, 1982. Although Turner soon received notice of these orders, he at no time sought to have them vacated.

In early May of 1982, Turner and other record owners of the Corporations met with William F. Macauley, Esq. ("Macauley") to seek legal advice concerning the

possibility of working out an arrangement with the Corporations' creditors. On May 13th, Macauley and Turner met with the petitioners and other trade creditors of the Corporations, including United. Counsel for several of the petitioners also attended. Macauley furnished the creditors with separate inventory, tax and trade debt figures for each of the Corporations. The total inventory value furnished was approximately $330,000 and the total debt figure was about $1,300,000. Tax debt, all for withholding taxes, totaled about $100,000. A bank debt figure for three of the Corporations totaling $45,000 was also furnished. Macauley told the creditors that Turner had personally guaranteed the bank debt as well as rent under a lease for one of the stores. Macauley stated that he and Turner preferred to make an arrangement with creditors outside of the bankruptcy court through a trust mortgage. He informed them that a possible payment plan would involve selling the assets of three or four of the Corporations in order to fund a payment to the creditors of all seven, with the remaining Corporations continuing to operate.

After the close of this meeting, in discussion among themselves, the petitioners expressed concern about the low inventory levels. The construction by Turner of a home in Duxbury was also discussed, as well as the fact that he drove a Jaguar. Several of the petitioners voiced the belief that Turner was taking more than normal salary out of the Corporations in order to fund a personal standard of living which was extravagant in light of the financial condition of the Corporations. Barry M. Portnoy, Esq. ("Portnoy"), who represented two of the petitioners, informed the group that his law firm, Sullivan & Worcester, had conducted a search of court records and had discovered the existence of the attachment order which United had obtained on the previous February 24th.

Turner and Macauley met again on May 20th with the petitioners and other creditors. Macauley told them that he no longer regarded a trust mortgage as a feasible alternative, and that he planned to file Chapter 11 petitions for all of the Corpora-

tions by the following Monday, May 24th. At the close of that meeting the creditors met among themselves. They elected a chairman and a secretary, and they decided to hire Robert Somma, Esq. ("Somma") of the Boston law firm of Goldstein & Manello as their counsel in connection with claims against Turner personally as well as to represent the creditors' committee in any Chapter 11 case of the Corporations.

Portnoy and several other counsel to individual petitioners met with Somma later that day. They apprised Somma of the general situation, including the fact that a number of checks of the various Corporations given to some of the petitioners as payments had been returned for insufficient funds. They discussed filing an involuntary Chapter 7 petition against Turner based on the ground that Turner was personally liable for the debts of the Corporations under any one or more of four theories: (1) piercing of the corporate veil; (2) oral guarantees of corporate debt; (3) negligence or misrepresentation in the issuance of checks later returned for insufficient funds; and (4) contractual liability on these checks under the Uniform Commercial Code. At the conclusion of that meeting, Somma, by his own testimony, "began to form the view" that Turner could be held liable under one or more of these theories. None of the lawyers had researched any of the theories up to that point. They, and particularly Portnoy and Somma, were relying primarily on their general experience, which included some substantial experience in commercial law and bankruptcy.

Upon returning to his office, Somma immediately instructed an associate to prepare an involuntary Chapter 7 petition against Turner and a motion for the appointment of a trustee so that the papers would be ready for signature at the meeting of creditors scheduled for Monday, May 24th. Neither he nor his associate did any research on the various theories supporting Turner's personal liability until that next Monday.

The petitioners and some of their respective counsel met with Somma at Somma's

office for almost three hours on May 24th. They were then aware that all seven of the Corporations had filed petitions under Chapter 11 the previous Friday. Portnoy informed them of his recent discovery of the May 17th court order authorizing an attachment of Turner's Duxbury home. Counsel reiterated to them what they had been previously told concerning the timing problem presented by the United attachment of February 24th, that is, that within a matter of hours this attachment would be 90 days old and therefore beyond attack as a preference. Somma consequently advised them that if a petition was to be filed against Turner it should be filed that day rather than later. That morning Somma had done some legal research on the various theories of Turner's personal liability and the question of whether claims against Turner under these theories were contingent as to liability so as to give them standing to file a petition under § 303. He reviewed with other counsel the case law on these issues, including *My Bread Baking Co. v. Cumberland Farms, Inc.*, 353 Mass. 614, 233 N.E.2d 748 (1968), which dealt with piercing the corporate veil, and *In re All Media Properties, Inc.*, 5 B.R. 126 (Bankr.S.D.Tex.1980), on the issue of whether their claims were noncontingent as to liability so as to give them standing to file. He asked questions of each of the petitioners' representatives concerning their knowledge of the Corporations' operations and Turner's involvement therein. He explained to them the danger of a damage award against them if the Court dismissed the involuntary filing. He and other counsel advised the petitioners that a Chapter 7 filing against Turner would have three possible advantages: application of Turner's own assets in payment of their claims, avoidance of the United attachments as preferences, and leverage in keeping pressure upon Turner in the Corporations' Chapter 11 cases. They advised petitioners to file. The petitioners and Somma then signed the petition, and it was filed that day. The filing has been, and continues to be, a substantial cause (along with Turner's general business problems) of discord between Turner and his wife, resulting in a few separations.

The foregoing represents the Court's principal findings of subsidiary facts. General findings and additional subsidiary findings appear later. We now turn to the question of whether the petition was filed in bad faith.

## II. THE ISSUE OF BAD FAITH FILING

### A. *The Bad Faith Standard in General*

Turner charges that petitioners are guilty of bad faith by reason of their motives in filing. He contends that petitioners were motivitated by a desire to harass him in proceedings under the pending Chapter 11 cases of the Corporations, and that the filing was the product of unwarranted suspicions that he was milking the Corporations. He asserts that either of these motivations constitutes bad faith under § 303(i)(2). He also contends that the filing lacked reasonable legal justification, and that this of itself constitutes bad faith. He argues, in summary, that the petitioners are guilty of subjective bad faith in their motivations for the filing and objective bad faith in filing the petition without reasonable legal justification for obtaining an order for relief under Chapter 7.

The drafters of the Bankruptcy Code gave the courts an empty chalice in the bad faith standard of § 303(i)(2), to be filled by developing case law based upon a myriad of circumstances which would be unforeseeable to the most imaginative of draftsmen. Unlike the Uniform Commercial Code,[4] the Bankruptcy Code presents us with neither a definitional section nor legislative history concerning the intended concept of bad faith. There is the suggestion in some of the decisions that two views have developed under § 303(i)(1), one requiring actual malice or the desire to harass or embarass, and the other finding bad faith where the bankruptcy court is used as a substitute for customary collection proce-

---

**4.** *See* Uniform Commercial Code §§ 1–201(19), 2–103(1)(b).

dures. *See, e.g., In re Wavelength, Inc.,* 61 B.R. 614, 619–20 (Bankr. 9th Cir.1986); *In re Johnston Hawks Ltd.,* 72 B.R. 361, 366 (Bankr.D.Haw.1987); *In re Advance Press & Litho, Inc.,* 46 B.R. 700, 703–04 (Bankr.D.Colo.1984). We fail to see an inconsistency in these instances of bad faith; they seem to be different facets of the same concept. Other decisions speak of subjective and objective standards, with some favoring an objective standard. *See, e.g., In re Grecian Heights Owners, Ass'n,* 27 B.R. 172 (Bankr.D.Or.1982) (petition held to be in bad faith where filing was made under mistaken belief, engendered by advice of a layman, that bankruptcy court would retry petitioner's claim that he had lost in the state courts).

■ We believe, for a number of reasons, that bad faith under § 303(i)(2) should be measured by the subjective and objective standards contained in Bankr.R. 9011. That rule, which tracks Fed.R.Civ.P. 11, applies to lawyers and parties alike, and it covers all pleadings and motions, including this petition. Rule 9011 appears to be all-encompassing in the indicia of bad faith which it sets forth, including a significant objective requirement bearing on the legal justification of a claim or defense: a reasonable inquiry into the facts and the law. It is therefore logical to adopt its standards in a § 303(i)(2) case in order to avoid conflicting standards. Rule 9011 provides in part:

> The signature of an attorney or a party constitutes a certificate that the attorney or party has read the document; that to the best of the attorney's or party's knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification or reversal of existing law; and that it is not interposed for any improper purpose,

such as to harass, to cause delay, or to increase the cost of litigation.

The virtually identical predecessor of Rule 9011, former Bankruptcy Rule 911, has been construed by the court of appeals for this circuit as requiring the exercise of good faith. *In re Crown Sportswear, Inc.,* 575 F.2d 991, 944 (1st Cir.1978). Bankr.R. 9011, moreover, has been considered controlling by some courts on the issue of bad faith under § 303(i)(2). Several have adopted a two pronged objective-subjective test based expressly or impliedly upon Rule 9011. *See In re Elsub Corporation,* 66 B.R. 189 (Bankr.D.N.J.1986); *In re Alta Title Company,* 55 B.R. 133 (Bankr.D.Utah 1985). *See also United States Fidelity & Guaranty Co. v. DJF Realty & Suppliers,* 58 B.R. 1008 (N.D.N.Y.1986) (bankruptcy court's findings of bad faith on the part of petitioner because of petitioner's solicitation of another to join in petition held in error); *In re Advance Press & Litho, Inc.,* 46 B.R. 700 (Bankr.D.Colo.1984) (after discussion of both tests, court concluded: "In the final analysis, it is essentially a question of fact").

Use of the Rule 9011 standards as the measure of bad faith under § 303(i)(2) would, furthermore, be consistent with the standards of bad faith developed by the courts for the dismissal of a voluntary petition under 11 U.S.C. § 1112, where courts have created a bad faith ground for conversion or dismissal even though it is not one of the grounds listed in the statute. *See In re The Bible Speaks,* 65 B.R. 415 (Bankr.D. Mass.1986). The adoption of such subjective and objective standards of good faith under § 303(i)(2) is also consistent with the concept of the good faith required of a merchant under Article 2 of the Uniform Commercial Code: "honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade."[5] Bankr.R. 9011, finally, is almost identical to the applicable disciplinary rules that regu-

---

5. U.C.C. § 2–103. Although the general definition of good faith contained in U.C.C. § 1–201(19) ("honesty in fact in the conduct or transaction concerned") seems to connote a sub-

jective standard, the courts have not hesitated to infer the need to meet an objective test of reasonable inquiry. *See, e.g., Hollis v. Chamberlin,*

late the practice of law in Massachusetts,[6] where petitioners' counsel is admitted to practice.

### B. *Legal Justification for Petition*

■ Petitioners seek protection from a charge of bad faith because they filed the petition on the advice of counsel. Because we adopt the dual standards contained in Rule 9011, clearly this position is untenable. The real question is whether counsel, as well as petitioners, were in violation of Rule 9011. We turn first to the rule's requirements that counsel form a belief of the legal justification of the filing, and that they form that belief after reasonable inquiry.

In order for petitioners to prevail in obtaining an order for relief against Turner under Chapter 7, they had to win on no less than three central legal issues: (1) whether the petitioners had claims against Turner personally; (2) whether those claims were contingent as to liability; and (3) whether Turner was generally not paying his debts as they became due, which primarily involved a determination of whether claims such as the petitioners', which are likely to be subject to a good faith dispute, are properly considered on the question. We treat each seriatim.

1. *Issue of whether petitioners' claims were claims against Turner personally*

Somma testified that at the time of the filing he had concluded Turner could be held personally liable to the petitioners under any one of four legal principles: (1) the theory variously described as "piercing the corporate veil," "alter ego" or "common enterprise"; (2) Turner's oral guarantees of corporate debt; (3) negligence or misrepresentation in the issuance of checks later returned for insufficient funds; and (4) statutory liability on these checks under the Uniform Commercial Code. The question of Turner's personal liability cannot, however, be viewed entirely in isolation from the question of whether he was generally paying his debts as they became due. If the petitioners were to rely, as they clearly did, primarily upon their own claims on this question, they could hardly rely on claims for bad checks. Another judge of this Court ruled that these checks created a liability of only about $50,000. Asserting liability by reason of the personal guarantees appears frivolous, even though Somma stated he believed that petitioners' reliance upon those oral guarantees was sufficient to escape the requirement of a writing contained in Mass.Gen.L. ch. 259, § 1. Not only does the reliance appear minimal, the words which Turner used were no more

---

4 U.C.C.Rep. 716, 243 Ark. 201, 419 S.W.2d 116 (1967).

**6.** Supreme Judicial Court of Massachusetts Rule 3.07, Disciplinary Rule 7–102, provides in part as follows:

(A) In his representation of a client, a lawyer shall not:

(1) File suit, assert a position, conduct a defense, delay a trial, or take other action on behalf of his client when he knows or when it is obvious that such action would serve merely to harass or maliciously injure another.

(2) Knowingly advance a claim or defense that is unwarranted under existing law, except that he may advance such claim or defense if it can be supported by good faith argument for an extension, modification or reversal of existing law. Rule 3.07 is based primarily on the canons and disciplinary rules promulgated many years ago by the American Bar Association. In 1983, the A.B.A. substituted for the canons and disciplinary rules new Model Rules of Professional Conduct, which

have not been adopted in Massachusetts. Rule 3.1 of these Model Rules is virtually identical to D.R. 7–102. It reads:

A lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis for doing so that is not frivolous. A lawyer may make a good faith argument for an extension, modification or reversal of existing law. The filing of an action or a defense is not frivolous merely because the facts have not been fully substantiated or because the lawyer expects to develop vital evidence only by discovery. And the action or defense is not frivolous even though the lawyer believes that the client's position ultimately will not prevail. It is frivolous, however, if the client wants the action taken primarily for the purpose of harassing or maliciously injuring a person, or if the lawyer is unable either to make a good faith argument on the merits of the action taken or to support the action taken by a good faith argument for an extension, modification or reversal of existing law.

than an expression of his determination to use efforts in his managerial capacity to have the Corporations pay.

The "piercing of the corporate veil" theory supports a reasonable belief that Turner could be held liable on claims of sufficient magnitude and number so as to present some reasonable prospect for passing muster under the "generally not paying" test. First of all, as previously discussed, the petitioners were aware of circumstances supporting a reasonable inference that Turner owned all seven of the Corporations, not just the three that he owned of record. They were also aware that on occasion some of the Corporations had ordered inventory for use by others in the group. And petitioners knew that Turner had spoken of a possible out-of-court plan which would treat the debt of all seven Corporations as one aggregate debt and would fund that debt through the sale of assets of three or four of the stores. They were not aware of the cooperative buying program approved by the ABCC. Counsel had available to them enough facts to present an arguable "piercing the corporate veil" case under decisions imposing liability upon a parent corporation, or one acting like a parent corporation, where there is a confused intermingling of activity by corporations engaged in a common enterprise. *See My Bread Baking Co. v. Cumberland Farms, Inc., supra.* The fact that two judges in the state courts had authorized United's attachments of Turner's real estate also supports the reasonableness of counsel's reliance on the "piercing of the corporate veil" theory. Counsel had obtained copies of the court papers in the United case. These disclosed that a suit against Turner based upon this same theory had been sufficient to convince two judges, albeit in an *ex parte* session, that the case presented a reasonable likelihood of success. We intend no intimation, however, as to the actual merits of such a case. Whether the facts here are sufficiently compelling to fall within this case law, in view of the overt cooperative buying program approved by the ABCC and in view of various other indicia of separateness among the Corporations, and whether an individual owner should be treated in the same fashion as a parent corporation, are matters that can only be resolved in litigation of the claims themselves.

### 2. *Issue of whether petitioners' claims were claims contingent as to liability*

The petitioners had standing to bring the petition only if their claims were "not contingent as to liability." 11 U.S.C. § 303(b)(1). Their counsel believed that this statutory requirement was intended only to exclude petitioners holding claims that could not ripen into a cause of action without some future triggering event, such as claims against a guarantor which do not accrue until default by the principal obligor. This was a reasonable interpretation of the statute. It was, moreover, consistent with the interpretation concerning contractual claims given in the leading case then on the books, *In re All Media Properties, Inc.,* 5 B.R. 126 (Bankr.S.D.Tex.1980), *aff'd mem.* 646 F.2d 193 (5th Cir.1981). The Court is satisfied that counsel read and relied upon *All Media* in giving their advice. Turner argues that this Court, in a prior decision in this case, has determined that petitioners' claims under the "piercing the corporate veil" theory are contingent as to liability in that they depend upon a subsequent court judgment, so that petitioners should not be permitted now to rely upon counsel's prior opinion to the contrary. But that decision can hardly be conclusive on the reasonableness of counsel's earlier interpretation of the statute. Moreover, in its prior decision this Court determined that petitioners had standing to bring the petition by reason of their claims on certain bad checks under the statutory liability imposed by § 3–403 of the Uniform Commercial Code.

### 3. *Issue of whether Turner was paying his debts as they became due, including whether debts subject to a bona fide dispute are properly considered in that determination*

Section 303(h)(1), as it read at the time of the petition, required that, in the event of a contest, petitioners be prepared to prove Turner was "generally not paying . . . [his] debts as such debts become due. . . ."

Turner contends that petitioners knew nothing about his personal indebtedness except to the extent that those debts and those of the Corporations were arguably the same, and that petitioners made no attempt to investigate the amount and nature of his personal debt or whether it was current. This is largely true. Other than the debt of the Corporations, which Turner arguably owed them, the petitioners knew of only of these personal debts: $45,000 of bank debt owed by the Corporations and guaranteed by Turner; about $100,000 of federal and state payroll taxes owed by the Corporations, some of which Turner would likely be personally responsible for under prevailing tax law; and a corporate lease which he had guaranteed. But the indebtedness which Turner arguably owed to the petitioners was of such a magnitude that it justified the petitioners in not looking into his personal financial picture.

Turner also argues, and to us this is the most compelling of his contentions, that petitioners and their counsel acted irresponsibly in thinking that debts subject to a *bona fide* dispute (as they should have known their claims against Turner would be) are properly considered in the determination of whether Turner was paying his debts as they became due. Turner points out that the district court, in affirming dismissal of the case on this issue, thought that petitioners' interpretation of the statute did not comport with common sense because a debtor's refusal to pay debts disputed in good faith does not indicate an inability to pay his debts. *In re Turner*, No. 86–1780–S, slip op. (D.Mass. Jan. 5, 1987) (unpublished decision).

We are less than satisfied with the performance of counsel to petitioners on this legal issue. They seem to have centered most, if not all, of their efforts upon the other legal issues. They may have concluded that claims subject to a *bona fide* dispute are includible in the "generally not paying" test by reason of the fact that § 101(4)(A) defines "claim" to include disputed claims and claims not reduced to judgment. If this was their reasoning, it was deficient because § 303(h)(1) phrases the test in terms of "debts" rather than "claims," unlike § 303(b)(1) which governs petitioners' standing to bring the petition. Nor are we much persuaded by the fact that it was not until 1984 that § 303 was amended so as expressly to exclude debts and claims in "bona fide dispute." "Debt" is defined in § 101(11) as *"[l]iability* on a claim" (emphasis added). Section 303(h)(1), therefore, even *re Covey*, 650 F.2d 877 (7th Cir.1981). In what strikes us as an obtuse piece of legal reasoning, the Seventh Circuit there fashioned a complex three-part test which disputed debts must pass if they were to be excluded from the "generally not paying" test. Included in this test was the requirement that it be unlikely for the dispute to require substantial litigation, a likelihood that was clearly not present here. We agree with Judge Friendly's observation that the *Covey* test is elaborate judicial gloss upon "treacherously simple statutory language." *In re B.D. International Discount Corp.*, 701 F.2d 1071, 1077 (2nd Cir.1983). *See also In re Dill*, 731 F.2d 629, 632 (9th Cir.1984). But we can hardly regard the use of reasoning embraced by a court of appeals as indicia of the bad faith of petitioners' counsel. Counsel should, furthermore, be allowed some leeway in their legal and factual basis for the commencement of a lawsuit. *Nemeroff v. Abelson*, 620 F.2d 339 (2nd Cir.1980); *Reinhardt v. United Automobile, Aerospace & Agricultural Workers of America*, 636 F.Supp. 864, 868 (E.D.Mich.1986.)

*4. The three issues in the aggregate*

Thus the petitioners had an arguable case on all three theories. Obviously, because they had to prevail on all three in order to maintain the petition, their chances for ultimate success in obtaining an order for relief under Chapter 7 were less than their chances for success under any one of the three theories. But this does not make the petition frivolous as a whole. Counsel believed in their chances for success on all three issues. We must also bear in mind that neither Rule 9011 nor the governing ethical rules restrict counsel to the support of existing law, but rather permit good faith argument for the extension, reversal or modification of that law. The existence of the first of the two United attachments, furthermore, required counsel to make a

quick decision in order to prevent that attachment from becoming immune from attack as a preference. Although the need for speed would surely not justify a frivolous petition, the press of time is properly a factor in assessing the reasonableness of counsel's investigation of the law and facts.

### C. *Petitioners' Motivations for the Filing*

The petitioners were not motivated entirely by their legitimate objectives for the filing, that is, the ability to apply Turner's personal assets in payment of their claim and the ability to void the United attachments. They also sought the personal bankruptcy of Turner in order to obtain, as one of their lawyers stated in a memorandum to his client, "potential leverage in keeping pressure on Mr. Turner's Chapter 11 cases." This is an improper purpose, one of harassment, which is proscribed by Bankr.R. 9011. Use of a bankruptcy petition as leverage to obtain advantage in another matter is an act of bad faith if it is the principal motivation for the filing. *In re Wavelength, Inc.*, 61 B.R. 614, 619–20 (Bankr. 9th Cir.1986); *In Johnston Hawks Ltd.*, 72 B.R. 361, 367 (Bankr.D.Haw.1987). We conclude, however, that the petitioners were primarily motivated by their reasonable belief that Turner's personal assets were properly subject to their claims and that the Chapter 7 petition was a proper means to assert this personal liability.

The filing was also prompted by petitioners' suspicions that Turner was milking the Corporations to feed an extravagant life style. There has been no evidence that he did this. The suspicions were, nevertheless, understandable. Turner was building a home at the seashore and driving a Jaguar at a time when the Corporations were floundering. The home was largely financed by insurance that covered a previous home destroyed in the 1978 blizzard, and the Jaguar, which was several years old, was obtained in settlement of a theft claim against an employee, but the petitioners did not know these facts at the time of the petition. Such suspicions, though not the most laudable aspect of human nature, do not taint petitioners' actions with bad faith.

### D. *Additional Allegations in the Petition*

Turner argues that certain additional allegations in the petition were intentionally false, and that as such they establish petitioners' bad faith. The petition alleged, as it had to, that Turner was not generally paying his debts as they became due, but it did so in this fashion: "The debtor is generally not paying his debts as they become due as indicated by the following: despite repeated demands, the debtor has failed to make payment of monies he had admitted are due and owing to the petitioners and to other ostensible creditors." Turner correctly points out that the petitioners never made claims upon him personally for their debts, and he certainly never admitted to a personal obligation for them. The petitioners rely upon demands made on Turner for the payment of a few bad checks at one of the general meetings in May. Even if such demands were made, they did not involve any large amount of debt. As to the alleged admissions, petitioners rely upon Turner's supposed oral guarantees already discussed.

The allegations in the petition of demands and admissions were surplusage. If the entity of the Corporations can be disregarded and personal liability thereby imposed upon Turner, under a "piercing the corporate veil" theory, the previous demands made upon the Corporations and their admission of liability would apply to Turner as well. We agree with petitioners that these allegations should be read as referring to the prior transactions with the Corporations and Turner's liability for those debts under that theory, to which reference had been previously made in the petition. Such unnecessary allegations should not, in any event, have the ability to vitiate a petition that presents an arguable case under § 303 and is not otherwise and primarily maliciously motivated.

### III. TURNER'S REQUEST FOR ATTORNEY'S FEES WITHOUT REGARD TO THE ISSUE OF BAD FAITH

In a brief filed several days after the close of his evidence, Turner requests relief

under § 303(i)(1), the subsection which authorizes the award of costs and a reasonable attorney's fee without requiring a finding of bad faith. He contends that the prior denial of such relief by another judge of this Court is not a bar, and urges the Court to revise the prior order in light of the evidence now before it which was not available to the other judge who decided the matter only on argument of counsel. He asks us to consider the prior order interlocutory on the ground that the other judge merely refused to exercise his discretion at that time.

The wording of the prior order lends some facial support to Turner's contentions. In denying the motion, the Court wrote on the motion:

> This was a complicated case in which another judge held two hearings and issued two detailed opinions prior to mine and the district court dealt with issues at some length. This was not on the record thus far a matter that court [sic] feels its discretion should be exercised, it is noted that an action that will deal more directly with what I presume to be Congress' intent has yet to be heard.

It would, however, be inappropriate for the Court to act at this time on Turner's request for attorney's fees. He has filed no new motion requesting the relief, so that the petitioners have had no opportunity to lodge an objection as to the procedure or on the merits. The Court, furthermore, desires the benefit of argument from counsel on the question of whether the prior order was interlocutory and for that reason subject to change, as well as on the question of whether the prior order, whether or not interlocutory, is not subject to revision because either (i) there are present no circumstances which justify its revision, or (ii) the Court has lost jurisdiction to act on the matter in light of Turner's appeal from the order. Turner must therefore file a separate motion on the matter. The hearing on any such motion will be without evidence.

The Court has already received evidence of Turner's attorney's fees.[7] The Court will also be free to take into account any findings of fact made here which are deemed relevant.

## IV. CONCLUSION

The petitioners and their counsel skated close to the edge of bad faith. The factors present here, pressure from a client and a lawyer's desire (and obligation) to represent a client zealously, can combine to bring a case over the edge. We are satisfied that did not happen in this case. The petitioners did not file their petition in bad faith. Turner's counterclaim must, therefore, be dismissed. A separate judgment to this effect has previously issued. Turner shall have ten days from the date of these findings and rulings within which to file a motion pertaining to costs or attorneys fees under § 303(i)(1). A prior order to this effect has also previously issued.

---

7. That evidence consisted of the testimony of a partner in the law firm representing Turner who affirmed an affidavit introduced into evidence which detailed the firm's services and hours expended in support of a requested fee of $205,000.00 for services and $21,098.68 for disbursements. The witness also stated that he would bill Turner a lesser amount if attorneys fees were not awarded by the Court, and that his usual hourly rate during some of the periods in question were less than the rates set forth in the affidavit.