## In re WEST SIDE COMMUNITY HOSPITAL, INC. d/b/a Sacred Heart Hospital, Alleged Debtor.

### Bankruptcy No. 89 B 8632.

United States Bankruptcy Court, N.D. Illinois, E.D.

March 15, 1990.

---

Daniel Zazove, Marilyn Kosin, Towbin & Zazove, Ltd., Chicago, Ill., for alleged debtor.

Tom Luetkemeyer, Hinshaw, Culbertson, Moelmann, Hoban & Fuller, Chicago, Ill., for petitioning creditors.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

JACK B. SCHMETTERER, Bankruptcy Judge.

This cause came on for trial before this Court on issues raised under 11 U.S.C. § 303 by the Involuntary Petition of Commercial Vision Corporation ("Commercial Vision"), Dorothea Bowlby ("Bowlby") and Franklin Boulevard Community Hospital ("Franklin Boulevard") (collectively the "Petitioning Creditors") against the alleged debtor West Side Community Hospital, Inc. d/b/a Sacred Heart Hospital ("West Side"). The court admitted evidence offered by the parties by stipulation and without objection, and then took testimony. After the Petitioning Creditors rested, West Side moved for dismissal under Bankruptcy Rule 7041(b) [Rule 41(b) F.R.Civ.P.]. For reasons stated hereinbelow, the Court finds a bona fide dispute as to claims of one creditor, and by separate order grants the motion under Bankr.R. 7041(b) and dismisses the Involuntary Petition and this case. For reasons also set forth, the request of Alleged Debtor for fees, expenses, and damages under 11 U.S.C. § 303(i)(1) and (2) is by the same order denied.

Pursuant to Bankruptcy Rule 7041(b) and Rule 52(a) F.R.Civ.P. (Bankr.R. 7052) the court hereby makes and enters the following Findings of Fact and Conclusions of Law at the close of evidence by the Petitioning Creditors:

## FINDINGS OF FACT

### The Franklin Boulevard Claim

1. At some time prior to May, 1988, the Board of Directors of Franklin Boulevard (the "Board") decided to solicit potential buyers for the acquisition of certain of Franklin Boulevard's assets.

2. As a result of the Board's decision to sell certain of Franklin Boulevard's assets, Franklin Boulevard received offers from, West Side, among other entities.

3. As a result of West Side's offer, the parties executed a Letter of Intent regarding the purchase of Franklin Boulevard.

*See* West Side Exhibit 1, July 29, 1988 Letter of Intent. Pursuant to the Letter of Intent, Franklin Boulevard agreed, among other things, "to assist and cooperate with the Buyers in assigning and obtaining the Seller's health maintenance organization agreements, public aid and medicare applications" and "(t)he Seller (agreed) to assist and cooperate with the Buyers in order to obtain JCAHO accreditation and licensure from the State of Illinois." *See* West Side Exhibit 1, July 29, 1988 Letter of Intent.

4. On September 12, 1988, Franklin Boulevard and West Side executed a sale of assets agreement (the "Sale Agreement"). *See* West Side Exhibit 3, the Sale Agreement.

5. The preamble to the Sale Agreement provided that:

(s)eller desires to sell and Buyer desires to purchase all of the property owned and used by Seller in the operation of Franklin Boulevard Community Hospital and the assets described herein and on attached exhibits, but specifically excluding those assets set forth and described on Exhibit "H" attached hereto and made a part hereof.

Exhibit H excluded the following assets:

a. Franklin Boulevard's pension plan;

b. Franklin Boulevard's self insurance trust;

c. Insurance policies on P.A. DeMoon; and

d. Personal effects of P.A. DeMoon.

*See* West Side Exhibit 3, Sale Agreement, at 1; Exhibit H.

6. With respect to merchantable title to hospital assets, the Sale Agreement provided, in relevant part, that:

¶ 1.10 "Assets" shall mean all of the Seller's assets existing at the close of business on July 31, 1988 described as follows: ... all of the office equipment, furniture and fixtures and all fixed durable medical equipment, valued at $500 or more, described in Exhibit "B" attached hereto and made a part hereof....[1]

¶ 2.0 (s)ubject to the terms and conditions of this Agreement, the Seller agrees to sell, transfer, assign and deliver to the Buyer on the closing Date, all of the rights, titles and interests in the Assets described on Section 1.10, and Buyer agrees to purchase the rights, titles and interests in the Assets.

¶ 2.1(b) (a)ll personal property to be conveyed hereunder, wherever located, shall be free and clear of all liens and encumbrances.

¶ 2.1(d) (s)eller represents that all of the items of property ... are all of the assets and properties used by Seller in the conduct of its business on July 31, 1988 and are located at the various premises indicated. Seller will not remove any of such property from any location without the written consent of the Buyer.

¶ 4.1(iv) (t)he Seller warrants and represents to the Buyer that: (iv) It has good and merchantable title to the assets described in paragraph 1.10 and such assets are free and clear of all mortgages, liens, encumbrances, easements, security agreements, equities, options, conditions or restrictions of any kind, except as set forth in Exhibit K.

*See* West Side Exhibit 3, Sale Agreement, at pp. 3, 5, 7.

7. Paragraph 2.1(c) of the Sale Agreement provided: "(t)he transfer of the Med Care Health Maintenance Organization membership and COMPASS Health Maintenance Organization membership shall be in accordance with their by-laws and the law of the State of Illinois." Paragraph 3.8(h) of the Sale Agreement provided that at closing Franklin Boulevard would transfer memberships in Med Care HMO and COMPASS HMO. Finally, paragraph 3.7(e) of the Sale agreement provided that the Sale Agreement was contingent upon the "(t)ransfer of ICARE and health maintenance organization contracts to Buyer." *See* West Side Exhibit 3, Sale Agreement, at pp. 8, 12, 13.

---

**1.** Exhibit "B" was never attached or incorporated into the Sale Agreement since the parties disputed the items to be included on this exhibit.

8. The agreed upon sale price for all Franklin Boulevard's assets was $1,400,000. With respect to any missing equipment, fixtures and furniture, paragraph 3.1 of the Sale Agreement, provided, in relevant part:

Buyer shall receive a credit against the purchase price for the fair market value of any items removed from the facility that were contemplated by the Buyer when entering into the Letter of Intent or were on the Hospital premises at the close of business on July 31, 1988.

See West Side Exhibit 3, Sale Agreement, at 9.

9. During the period from and after August 1, 1988, through the closing of the sale on November 18, 1988, disputes arose between Franklin Boulevard and West Side regarding the condition of the premises, West Side's expense in obtaining JCAHO accreditation and the presence of certain fixtures, equipment and furniture represented by Franklin Boulevard to be owned by Franklin Boulevard and located on the hospital premises.

10. As a result of an inventory by West Side of Franklin Boulevard's assets, on September 22, 1988, West Side's counsel Carrane wrote to Franklin's counsel Tom Luetkemeyer ("Luetkemeyer") and Edmund Gronkiewicz ("Gronkiewicz") regarding items missing from the hospital. At that time, West Side claimed that the missing items had a purchase cost of $503,790. See West Side Exhibit 4, Carrane's September 22, 1988 Letter with attached Inventory Summary.

11. Pursuant to paragraphs 3.5 and 8.4 of the Sale Agreement, West Side was not responsible for pre-August 1, 1988 debt. See West Side Exhibit 3, Sale Agreement, at 11, 24–25. In or about September, 1988 Edith Rolewicz ("Rolewicz"), P.A. DeMoon's sister, released checks without authorization by an officer of West Side to pay pre-August 1, 1988 Franklin Boulevard bills which totalled approximately $80,000. See West Side Exhibit 44, Summary of Unauthorized Checks, and Checks Paid by Rolewicz.

12. On September 30, 1988, Carrane again wrote to Luetkemeyer and Gronkiewicz alleging items missing from the hospital, and some said to be in a state of disrepair. See West Side Exhibit 5, Carrane September 30, 1988 Letter.

13. On October 10, 1988, Luetkemeyer and Gronkiewicz wrote to Carrane in response to, among other things, the unauthorized release of checks. Luetkemeyer and Gronkiewicz admitted "that the release of funds in question was a mistake...." See West Side Exhibit 6, Luetkemeyer and Gronkiewicz October 10, 1988 Letter.

14. On October 17, 1988 Carrane wrote to Luetkemeyer regarding the transfer of Med Care HMO. Carrane stated that a

... matter which we have not heard back from you is regarding the Med Care membership. Our research revealed that membership can only be transferred to a not-for-profit entity. Please advise how your client intends to transfer membership.

See West Side Exhibit 7, Carrane October 17, 1988 Letter.

15. On October 26, 1988, Carrane wrote to Luetkemeyer and Gronkiewicz again, requesting Franklin Boulevard's response regarding the transfer of membership in Med Care HMO. Carrane also informed Luetkemeyer and Gronkiewicz that West Side would expect credits against the $1.4 million purchase price for, among other things, the JCAHO fee, overtime attributable to JCAHO accreditation and additional personnel hired for JCAHO accreditation. Carrane also wrote Luetkemeyer and Gronkiewicz with respect to allegedly missing fixtures and equipment:

(w)ithout the availability of the current Appraisal, it is believed that a minimum of $350,000 of fixtures and equipment is missing from the Hospital at this time which was contemplated by the Buyer when entering into the Letter of Intent. This figure is based upon the cost at purchase indicated in the physical inventory recently conducted....

See West Side Exhibit 8, Carrane October 26, 1988 Letter.

16. On October 31, 1988, Carrane again wrote to Luetkemeyer. Carrane noted that:

(a)s I advised you at the October 12, 1988 meeting, when Mr. Novak and I met with Mr. P.A. DeMoon in May, 1988, he presented us with a copy of an Appraisal, which he represented was current, and the only one available to accurately reflect the equipment, furniture and fixtures which were part of the sale transaction. I refer you to Paragraph 3.1 of the Sale of Assets Agreement, which provides in part as follows:

Buyer shall receive a credit against the purchase price for the fair market value of any items removed from the facility that were contemplated by the Buyer when entering into the Letter of Intent or were on the Hospital premises at the close of business on July 31, 1988.

Carrane also referred Luetkemeyer and Gronkiewicz to paragraph 3.7(A)(d) of the Sale Agreement:

(w)hich provides that the Buyer's obligation to perform under the Contract is contingent upon JCAHO accreditation. Paragraph 14.10 provides that each party shall bear its own costs in entering into and in consummating the transaction. Therefore, since JCAHO accreditation is clearly a condition precedent to be satisfied by the Seller, and each party is to bear its own costs, the costs of JCAHO accreditation may be considered the Seller's cost of doing business, but by virtue of the terms of the Contract, it is not the Buyer's obligation.

See West Side Exhibit 9, Carrane October 31, 1988 Letter. On November 1, 1988, Luetkemeyer responded with regard to the JCAHO expenses that they were buyer's responsibility. As to the alleged missing property he flatly said that "we do not consider the missing items proper subjects of negotiations for credits." Petitioners Exhibit 5.

17. On November 10, 1988, Carrane wrote to Luetkemeyer again stating, among other things, that the "Med Care membership is an asset to be transferred under the Sale Agreement without the necessity of the Purchaser paying a fee." See West Side Exhibit 10, Carrane November 10, 1988 Letter.

18. On November 15, 1988, Sondra Rafferty, the president of Med Care HMO, wrote to Luetkemeyer. Rafferty stated that:

(t)he current agreement between Med Care HMO and Franklin Boulevard Community Hospital provides for both a Provider and an Associate Member Status with Med Care HMO. Therefore this contract cannot be assigned to the West Side Community Hospital, Inc.... (i)n regards to Franklin Hospital's associate member status with Med Care HMO, the Board has tabled their decision on assignment of this membership to West Side Community Hospital, Inc. until our attorney can review the implications of its "for profit status" on Med Care HMO, a not-for-profit organization.

See West Side Exhibit 11, November 15, 1988 Letter from Rafferty to Luetkemeyer.

19. On November 15, 1988, three days prior to closing, Luetkemeyer informed Carrane and Linda Consolo ("Consolo") that Franklin Boulevard could not transfer its membership with COMPASS or its membership with Med Care HMO in full. Luetkemeyer stated that "West Side can continue to do business with Med Care on the same terms and conditions included in the Franklin Provider Agreement, or it would be free to execute a new agreement upon the same or other mutually agreeable terms ... (t)he Bylaws of COMPASS do not allow us to assign membership...." See West Side Exhibit 12, Luetkemeyer November 15, 1988 Letter.

20. Prior to the sale closing, Franklin Boulevard conceded to West Side a $250,000 reduction for the purchase price of the hospital. In consideration of that credit, West Side expressly in writing waived Franklin Boulevard's representations with respect to the "condition of the real estate, improvements, machinery, equipment and supplies" and West Side agreed "to accept the assets transferred by Seller in an 'as is' condition." (emphasis supplied).

*See* West Side Exhibit 13, Closing Credit Agreement. *See also* West Side Exhibit 12, Luetkemeyer November 15, 1988 Letter ("The Closing Credit Agreement reflects both the credit and the agreement of West Side to accept the assets transferred by Franklin Boulevard in an 'as is' condition").

21. The Closing Credit Agreement did not expressly provide for waiver by West Side of Franklin Boulevard's representations that it owned all of the assets to be sold to West Side free and clear of any liens. Moreover, the Closing Credit Agreement did not refer to any of the other outstanding disputes between Franklin Boulevard and West Side including, among other things, the transfer of health care memberships to West Side; the allegedly missing fixtures, equipment and furniture; and the cost of JCAHO accreditation.

22. Prior to the closing, West Side acknowledged that it utilized accounts receivable owned by Franklin Boulevard in the approximate amount of $495,144, and that this amount would be paid in full six months following the closing. *See* West Side Exhibit 14, Acknowledgment of Accounts Receivable.

23. No evidence was offered to this Court, other than the foregoing documents, as to pre-closing meetings or discussions of the parties or their counsel to negotiate the $250,000 credit referred to in the Closing Credit Agreement.

24. The closing was completed on November 18, 1988. At the closing, Franklin Boulevard provided West Side with a bill of sale which provided, in relevant part, that Franklin was selling

> all personal property existing on the premises of FRANKLIN BOULEVARD COMMUNITY HOSPITAL as of August 1, 1988, and including that property described in a Property Record Report dated June 30, 1988, prepared by American Appraisal Associates for FRANKLIN BOULEVARD COMMUNITY HOSPITAL. . . .

*See* West Side Exhibit 15, Bill of Sale. West Side now contends that much of that property was missing.

25. Subsequent to closing, proceeds received by Franklin Boulevard were to be utilized to pay unsecured creditors of Franklin Boulevard. Unsecured creditors were to receive $.25/dollar. P.A. DeMoon and P.S. DeMoon who are officers of Franklin Boulevard are also directors and employees of Central Community Hospital ("Central"). Central was the only secured creditor of Franklin Boulevard. Central received $100,000 of the $1.8 million secured debt owed to it by Franklin Boulevard. In addition to Central being paid $100,000, rather than receive the proposed .25/dollar distribution to unsecured creditors, subsequent to the proposed composition to Franklin Boulevard creditors, P.A. DeMoon was paid in full on his unsecured debt in the amount of $195,613.00. *See* West Side Exhibit 16, Checks payable to Central and P.A. DeMoon. *See also* West Side Exhibit 47, P.S. DeMoon Deposition Transcript at 19–22.

26. On December 12, 1988, Carrane informed Luetkemeyer and Gronkiewicz in a post-closing letter that Franklin Boulevard did not notify another health care organization, Blue Cross, of the change in ownership of the hospital: "(a)s you know, the Seller must file a final Cost Report with Blue Cross and otherwise terminate its relationship with Blue Cross. The Seller's failure to advise Blue cross of the change of ownership has placed an obstacle in the path of my client in attempting to commence its relationship with Blue Cross." Carrane also demanded that Franklin Boulevard pay approximately twenty-five creditors who had not received the proposed .25/dollar distribution. *See* West Side Exhibit 17, Carrane December 12, 1988 Letter.

27. In or about December, 1988, P.A. DeMoon caused the postal service to forward all mail addressed to Franklin Boulevard at 3240 West Franklin Boulevard to an address at 3909 West Fullerton. Franklin Boulevard had access to the hospital mail at that address and deposited Illinois Department of Public Aid checks thereby received such checks aggregating approximately $71,000 into Franklin Boulevard's

accounts. *See* West Side Exhibit 18, Carrane January 19, 1989 Letter.

28. On May 15, 1989, Luetkemeyer and Gronkiewicz wrote to Carrane and Consolo and made a formal demand on West Side for payment in the amount of $483,137.40. *See* West Side Exhibit 19, Luetkemeyer and Gronkiewicz May 15, 1989 Letter.

29. The May 15, 1989 letter threatened the filing of an involuntary petition in bankruptcy if payment in the requested amount of $483,137.40 was not made within three days. *See* West Side Exhibit 19, Luetkemeyer and Gronkiewicz May 15, 1989 Letter.

30. On June 1, 1989, West Side was informed by Karen Paul, Vice President of Provider Relations of COMPASS Health Care Plans, that (i) COMPASS bylaws prohibit the assignment of corporate membership in COMPASS from Franklin Boulevard to West Side, and (ii) COMPASS declined to pursue a provider contract with West Side. *See* West Side Exhibit 20, Paul June 1, 1989 Letter to Novak.

31. A bona fide dispute still exists between Franklin Boulevard and West Side as to whether or not the parties resolved all their disputes by Franklin Boulevard granting a $250,000 credit at closing, or only resolved thereby a portion of the disputes previously described in written communications between their counsel. No evidence was offered as to negotiations leading up to the final offer and acceptance of the $250,000 credit. The release document did not by its terms release all the disputes earlier raised. Franklin Boulevard's counsel expressly declined prior to closing to negotiate at all over the allegedly missing equipment. The value of issues that West Side still contests equals or exceeds the balance now sought by Franklin Boulevard. Franklin Boulevard provided strong evidence that all such disputes were resolved by the $250,000 credit at closing. While it seems unlikely that Franklin Boulevard would have offered a $250,000 credit unless it believed that it was settling all disputes, this Court cannot find from the evidence presented by Petitioning Creditors that such a conclusion is not subject to bona fide disputes. There is a substantial objective basis from which this Court finds that such disputes do indeed exist.

### The Commercial Vision Claim

32. Franklin Boulevard leased television sets, public address system, and the interior and exterior security and intercom systems from Commercial Vision pursuant to a May 10, 1986 lease and maintenance agreement. *See* West Side Exhibit 21, May 10, 1986 Lease and Maintenance Agreement between Commercial Vision and Franklin Boulevard.

33. Under the May 10, 1986 lease and maintenance agreement, maintenance on the leased equipment was performed by a servicing firm subcontracted by Commercial Vision. *See* West Side Exhibit 46, Kaluzna Deposition Transcript, at 20–21.

34. On or about November 21, 1988, Commercial Vision sent Franklin Boulevard's bill to Carrane of West Side, although no contract then existed between Commercial Vision and West Side. *See* West Exhibit 22, Miller November 21, 1988 Letter.

35. On December 2, 1988, Commercial Vision sent to Novak of West Side a copy of the May 10, 1986 lease and maintenance agreement with Franklin, as Novak requested. *See* West Side Exhibit 23, Kaluzna December 2, 1988 Letter.

36. On December 27, 1988, Novak of West Side wrote to Kaluzna of Commercial Vision requesting breakdown of charges as between the security cameras and televisions. *See* West Side Exhibit 24, Novak December 27, 1988 Letter.

37. On January 4, 1989, Kaluzna wrote to Novak enclosing a breakdown of Commercial Vision's monthly charges to West Side. *See* West Side Exhibit 25, Kaluzna January 4, 1989 Letter.

38. On February 6, 1989, Kaluzna wrote to Edward Lorgeree ("Lorgeree"), the Vice President of Sacred Heart, setting forth his understanding of mutually agreed-upon changes between Commercial Vision and West Side to the lease and maintenance agreement Commercial Vision had earlier

entered into with Franklin Boulevard. *See* West Side Exhibit 26, Kaluzna February 6, 1989 Letter. The parties orally and impliedly agreed to be bound by the earlier agreement as thereby amended. Pursuant to the agreed changes, some equipment was to be and later was removed, and the total monthly charge reduced from $2,750 to $1,200.

39. Thereafter, Commercial Vision sent bills to West Side for the months January, 1989 through May, 1989. The April and May invoice erroneously sought monthly amounts of $2,750 from West Side. That $2,750 amount was the previous amount Commercial Vision charged Franklin Boulevard, not the $1,200 reduced monthly payment agreed to in February. *See* West Side Exhibits 27 through 33, Invoice Statements from Commercial Vision. *See also* West Side Exhibit 46, Kaluzna Deposition Transcript, at 42–43.

40. West Side made two payments to Commercial Vision, $1,200 on March 8, 1989, and $2,400 on March 29, 1989. Those payments covered three monthly payments at the agreed reduced rate.

41. Kaluzna prepared a summary of the obligations West Side then owed and still owes to Commercial Vision. *See* West Side Exhibit 32, May 20, 1989 Summary of West Side's Obligations to Commercial Vision, West Side Exhibit 46, Kaluzna Deposition Transcript, at 57. That summary correctly shows a balance due from West Side to Commercial Vision as of May, 1989 in the amount of $8,400.

42. Based on the foregoing, no bona fide dispute exists as to Commercial Vision's claim for monies due in the amount of $8,400 as of May, 1989, and no objective basis exists for any such dispute.

### The Bowlby Claim

43. Bowlby was and is in the business of finding and placing trained medical personnel for hospitals and other medical establishments. Jane Poremski was a qualified supervisory nurse who Bowlby placed with West Side. Ms. Poremski first interviewed with P.A. DeMoon of Franklin Boulevard in May, 1988. *See* West Side Exhibit 35, September 8, 1988 Letter from Bowlby to Poremski; West Side Exhibit 45, Bowlby Deposition Transcript at 6–7. She was not hired at that time. After West Side took over operation of the hospital from Franklin Boulevard, it sought a supervisory nurse. Bowlby sent Nurse Poremski back to be reinterviewed for the position. Ms. Poremski was then hired by West Side.

44. Bowlby billed West Side for her usual fee but was unable to collect from West Side. Bowlby then contacted P.S. DeMoon on numerous occasions regarding collecting her commission due as a result of placing Poremski. *See* West Side Exhibits 37 and 38, October 8, 1988 Letter to P.S. DeMoon from Bowlby; December 2, 1988 Letter to P.S. DeMoon and P.A. DeMoon from Bowlby.

45. On December 9, 1988, Bowlby wrote to Ray Stewart (controller of West Side) stating that she was voluntarily reducing her commission from her usual $9,000 to $5,000. *See* West Side Exhibit 39, Bowlby December 9, 1988 Letter. No one on behalf of West Side told or wrote Bowlby at this time that it disputed her claim.

46. On or about December 16, 1988, West Side tendered Bowlby a check for $500 endorsed by it as "accord and satisfaction". *See* West Side Exhibit 40, Check No. 1540. After consulting her counsel, Bowlby crossed off the restrictive endorsement on the back of the check which stated "accord and satisfaction" and in its place wrote (sic) "NOT IN COMPROMISE IN AMOUNT DUE and IN AMOUNT DUE AND OWING (9,500) Balance now due is $9,000 2–7–1989". *See* West Side Exhibits 40 and 45. At the time Bowlby received the check, she understood that West Side intended to pay her only that $500.

47. In February, 1989 Bowlby sued West Side in the Circuit Court of Cook County, Municipal Division, for $8,500. *See* West Side Exhibit 41, Bowlby Complaint. On March 27, 1989, West Side filed an Answer and Affirmative Defense to the Complaint. *See* West Side Exhibit 42, Answer and Affirmative Defense. West

Side's Answer to that suit admitted that it hired Poremski, but denied that it hired Poremski as a result of any efforts undertaken by Bowlby. The Affirmative Defense stated, among other things, that:

(i)n approximately October, 1988 a demand was made upon Defendant for payment of $9,000 by Plaintiff. Defendant denied that it owed any obligation to Plaintiff and suggested to Plaintiff that Defendant was willing, for the purpose of settlement only and without either party admitting liability to the other, to pay to Plaintiff the amount of $500 in full and complete payment in accord and satisfaction of the amount claimed by Plaintiff. Plaintiff agreed to this accord and satisfaction and further agreed that her claim was settled for the total of $500.

See West Side Exhibit 42, Answer and Affirmative Defense, at ¶ 2. However, prior to tender by West Side of its $500 check to Bowlby endorsed "accord and satisfaction" and her deposit of that check, there were no oral or written denials by West Side to her of its liability, and no disputes of its obligation to pay her the $5,000 reduced commission to which she agreed. Nor did West Side and Bowlby ever agree that West Side would pay only $500 in accord and satisfaction of her claim. West Side did not dispute Bowlby's commission claim prior to its tender of the $500 check or prior to her litigation. In view of the legal conclusions on this claim set forth hereinbelow, there is no bona fide dispute that West Side now owes Bowlby $4,500 ($5,000 agreed to by Bowlby as her full fee, less the $500 paid), and there is no objective basis for any such dispute.

### Filing of the Involuntary Petition

48. Prior to May 22, 1989, Normal Hepkin ("Hepkin"), a board member of Franklin Boulevard and the former assistant to P.A. DeMoon, informed the other two petitioning creditors—Commercial Vision and Bowlby—that Franklin Boulevard intended to file an involuntary bankruptcy petition against West Side, and they agreed to join in it. See West Side Exhibit 48, Hepkin Deposition Transcript, at 20–24. From the

evidence and testimony it is clear that each joined with Franklin Boulevard in the Involuntary Petition in an effort to obtain Court supervision of an orderly liquidation of West Side for equal benefit of all creditors and to avoid some creditors being preferred over others in a situation where West Side was not generally paying its debts when due. See also West Side Exhibit 45, Bowlby Deposition Transcript at 30–31; West Side Exhibit 46, Kaluzna Deposition Transcript, at 51–52; West Side Exhibit 47, P.S. DeMoon Deposition Transcript, at 40.

49. The Petitioning Creditors adequately investigated whether West Side was generally paying its debts as they became due on or about the Petition Date. They knew prior to filing the involuntary petition that many substantial debts of West Side were not being paid by it as those debts generally became due.

### Insolvency of West Side

50. Although responsible for payment of federal employee withholdings after August 1, 1988, West Side failed to make payment for those amounts collected under the Franklin federal tax identification number for the final quarter of 1988, despite filing a return. See Pet Ex. 36.

51. The accounts payable aging report of West Side, dated August 17, 1989, shows that as of that date West Side owed hundreds of creditors a total of $690,074.27 in debt which was 120 days or more old. Pet Ex. 31.

52. The aging report, referred to above, along with the Accounts Payable invoice registrar, see Pet Ex. 32, shows that West Side was not paying its debts as they became due.

53. West Side does not have cash currently available to bring all of its debts current to thirty days, and did not as of the date the Involuntary Petition was filed.

54. West Side does not have cash currently available to bring all of its debts current to sixty days, and lacked such cash assets as of the date of filing of the Involuntary Petition.

55. West Side is unable to pay its debt as it becomes due, and was unable to do so at the time the Involuntary Petition was filed.

### General

56. Fact statements contained in the Conclusions of Law will stand as additional Findings of Fact.

## CONCLUSIONS OF LAW

1. This Court has core jurisdiction of the subject matter of this involuntary proceeding pursuant to 28 U.S.C. §§ 157(b) and 1334, and the General Order of Reference entered by the United States District court for the Northern District of Illinois on July 10, 1984.

2. The involuntary petition initiated a contested matter within the meaning of Bankruptcy Rule 9014 to which Part VII of the Bankruptcy Rules, and certain Federal Rules of Civil Procedure, apply.

3. To the extent appropriate, any Finding of Fact may be considered as a Conclusion of Law, and vice-versa. *U.S. ex rel. Nelson v. Reliance Insurance Co.*, 436 F.2d 1366 (10th Cir.1971); *Utzinger v. United States*, 432 F.2d 485 (6th Cir.1970).

### Bona Fide Dispute

■ 4. For creditors to petition successfully for involuntary bankruptcy, under 11 U.S.C. § 303 a court must determine that the creditors have standing and that the alleged debtor generally has not been paying his debts as they become due. *Bartmann v. Maverick Tube Corp.*, 853 F.2d 1540, 1543 (10th Cir.1988) (quoting *In re Johnston Hawks, Ltd.*, 49 B.R. 823, 828 (Bankr.D.Hawaii 1985)). Where, as here, the number of creditors exceeds twelve, at least three qualified creditors must join in the filing of the involuntary petition. 11 U.S.C. § 303(b)(2).

5. The burden is upon the Petitioning Creditors to prove each element of their case, including:

a) That they constitute a sufficient number of creditors holding claims in a sufficient amount to confer jurisdiction upon this court to sustain an involuntary petition as required by 11 U.S.C. § 303(b)[1];

b) That their claims are not contingent as to liability or the subject of a bona fide dispute [as required by 11 U.S.C. § 303(b)(1) ]; and

c) That as of the filing of the petition the alleged debtor was generally not paying its debts which are not subject to bona fide disputes as they become due [as required by 11 U.S.C. § 303(h)(1) ]. *See In re Better Care, Ltd.*, 97 B.R. 405, 418 (Bankr.N.D.Ill.1989).

■ 6. The policy underlying the "bona fide dispute" exception is to prevent creditors from using the bankruptcy court as a means of collecting disputed claims. *In re Nordbrock*, 772 F.2d 397, 399 (8th Cir. 1985). *See also In re Lough*, 57 B.R. 993, 996 (Bankr.E.D.Mich.1986).

■ 7. The term "bona fide dispute" is not defined in the Bankruptcy Code. The standard in the Seventh Circuit as to what constitutes a bona fide dispute is as follows: "(t)he bankruptcy court must determine whether there is an objective basis for either a factual or legal dispute as to the validity of a debt." *In re Busick*, 831 F.2d 745, 750 (7th Cir.1987). Under this standard, a court need not determine the probable outcome of the dispute, but merely whether one exists. *Id.*

8. The Seventh Circuit's standard has been cited with approval and followed by numerous courts, including *Bartmann*, 853 F.2d at 1543–44 (adopting the Seventh Circuit's "objective" standard).

■ 9. A claim which is the subject of a bona fide dispute must be eliminated from any calculation of whether a debtor generally was not paying his debts as they came due. *Busick*, 831 F.2d at 746.

10. "If there is a bona fide dispute as to either law or the facts, then the creditor does not qualify and the petition must be dismissed." *Busick*, 831 F.2d at 750.

■ 11. In this case, since Franklin Boulevard's claim is subject to bona fide disputes, that creditor does not have stand-

ing to prosecute the involuntary petition. Only three creditors filed, but only two qualify. Consequently the petition must be dismissed.

12. Prior to the closing on the sale of certain of Franklin Boulevard's assets, substantial disputes arose with West Side as to allegedly missing equipment; the physical condition of the hospital premises and equipment there; alleged fire code hazards in the Intensive Care Unit; leaks in the roof; electrical problems; hospital linens removed by Franklin Boulevard to another hospital; and Franklin Boulevard's ability to transfer its memberships in Med Care HMO and COMPASS HMO to West Side.

13. There remains after the closing objective and bona fide dispute as to whether or not at the closing the issue of missing equipment remained unresolved, as well as reimbursement claims by West Side for costs it incurred in obtaining JCAHO accreditation, and other claims and disputes.

14. (a) The Closing Credit Agreement did not provide for West Side's waiver of representations that Franklin Boulevard had free and clear title to certain equipment, fixtures and furniture, and did not waive claims for missing equipment. The closing Credit Agreement merely provided that West Side would take the owned equipment in an "as is" condition.

(b) The Illinois Uniform Commercial Code explicitly provides for the as-is disclaimer in Ill.Rev.Stat., ch. 26 ¶ 2–316(3)(a). Under § 2–316(3)(a) the "as-is" disclaimer may serve to disclaim "implied warranties." There are two such warranties: the "merchantability" warranty of § 2–314 and the "fitness for a particular purpose" warranty of § 2–315. The "as-is" disclaimer, however, does not operate as a disclaimer of either the "title" warranty of § 2–312 or of any "express" warranty under § 2–313. See L & L Trading Co., Inc. v. Tenneco Oil Co., 693 F.Supp. 470 (E.D.La.1988) (attempted disclaimers providing for the sale of crude slop oil "as is" and "without guaranties" and requiring buyer to test product to its own satisfaction were inconsistent with express warranties that the crude slop oil consisted of normal crude oil, water,

naptha, that it had been tested and was determined to have commercial value, and that it could be blended, and, thus, were without legal effect).

(c) In this case, the Closing Credit Agreement "as is" provision was drafted by counsel for Franklin Boulevard and, accordingly, must be construed against it. See Weiland Tool & Manufacturing Co. v. Whitney, 44 Ill.2d 105, 251 N.E.2d 242 (1969). The "as is" language in the Closing Credit Agreement does not negate the express warranty of title to the assets being sold as provided in the Sale Agreement and the express representations made to West Side that Franklin Boulevard owned all of the assets it was selling. See Ill.Rev. Stat., ch. 26 § 2–313(1)(a) ("any affirmation of fact or promise" may rise to an express warranty).

15. In addition to the unresolved issue as to the allegedly missing equipment which was asserted to have a cost replacement value in excess of $300,000, subsequent to the closing West Side was unable to receive full membership in Med Care HMO and COMPASS HMO.

16. There is no objective bona fide dispute as to the claim of Commercial Vision, as found in the Findings hereinabove. It provided a service under either an implied contract or oral agreement to a modified version of its former contract with Franklin Boulevard, all for an agreed reduced monthly payment.

17. As to Bowlby, West Side did not dispute that Bowlby is owed a commission for placing Poremski with West Side until after she filed suit.

18. (a) The $500 payment to Bowlby was not an accord and satisfaction. Under Illinois law, if and only if there is a dispute between the parties does a tender of partial payment by a debtor with explicit understanding of both parties that such payment is in full payment of the dispute, and an acceptance by the creditor of that tender, result in an accord and satisfaction. See Lowrance v. Hacker, 866 F.2d 950, 952 (7th Cir.1989) (commodities trader failed to establish the existence of any bona fide dis-

pute regarding a debt such as might have formed a basis for an accord and satisfaction); *See also Nelson v. Fire Insurance Exchange*, 156 Ill.App.3d 1017, 109 Ill.Dec. 516, 518, 510 N.E.2d 137, 139 (1987), *appeal denied*, 116 Ill.2d 562, 113 Ill.Dec. 303, 515 N.E.2d 112 (1987) and *Quaintance Associates, Inc. v. PLM, Inc.*, 95 Ill.App.3d 818, 51 Ill.Dec. 153, 155–56, 420 N.E.2d 567, 569–70 (1981).

(b) "If there is a bona fide dispute as to the amount due, it makes no difference that the creditor protests that he does not accept the amount in full satisfaction. The creditor must either accept the payment with the condition or refuse." *Nelson*, 109 Ill.Dec. at 518, 510 N.E.2d at 139 (quoting *Quaintance Associates*, 51 Ill.Dec. at 156, 420 N.E.2d at 570). "Cashing a check offered with the condition that it is in full payment of claims of the creditor, although the creditor before endorsing the check includes language that it is not releasing its claim, nonetheless, constitutes acceptance." [2] *Id.*

(c) Bowlby admits that she understood the $500 check was tendered in full settlement of her alleged commission, and she cashed the check after adding a restrictive endorsement. However, because no disputes of Bowlby's claim preceded the tender of West Side's check with its "accord and satisfaction" endorsement, her acceptance of it did not create an accord and satisfaction.

(d) Bowlby is entitled to a fee for placing Jane Poremski because (1) she discussed Miss Poremski with West Side; (2) West Side agreed to interview Poremski; (3) Poremski agreed to interview with the Alleged Debtor; (4) Bowlby and the Alleged Debtor set the arrangements in motion for the interview; and (5) the Alleged Debtor hired Poremski at a beginning salary of $60,000.00. *Polytechnical Consultants, Inc. v. All–Steel, Inc.*, 134 Ill.App.3d 187, 89 Ill.Dec. 63, 479 N.E.2d 1069 (1985); *Michael David Associates, Inc. v. GTE Network Systems, Inc.*, 182 Ill.App.3d 87, 130 Ill.Dec. 616, 537 N.E.2d 945 (1989), *appeal*

*denied*, 127 Ill.2d 620, 136 Ill.Dec. 590, 545 N.E.2d 114 (1989).

(e) An "accord and satisfaction" is an agreement between parties which settles a bona fide dispute over an unliquidated sum. To constitute an accord and satisfaction, there must be a dispute between the parties, a tender with the explicit understanding of both parties that it was in full payment of all demands and an acceptance by the creditor with the understanding that the tender is accepted in full payment. *Polin v. Major*, 150 Ill.App.3d 854, 104 Ill. Dec. 92, 93, 502 N.E.2d 355, 356 (1986); *Gord Industrial Plastics, Inc. v. Aubrey Manufacturing, Inc.*, 103 Ill.App.3d 380, 59 Ill.Dec. 160, 431 N.E.2d 445 (2nd Dist. 1982); *W.E. Erickson Construction, Inc. v. Congress–Kenilworth Corp.*, 132 Ill. App.3d 260, 87 Ill.Dec. 536, 477 N.E.2d 513 (1st Dist.1985), *aff'd*, 115 Ill.2d 119, 104 Ill.Dec. 676, 503 N.E.2d 233 (1987).

(f) Acceptance of partial payment of a fixed and certain sum due and which is not in dispute is not a satisfaction of the entire debt even where the creditor agrees to receive a part for the whole and gives a receipt for the entire demand. *Quaintance*, 95 Ill.App.3d at 821–22, 51 Ill.Dec. at 155–56, 420 N.E.2d at 569–70; *Lowrance*, 866 F.2d 950.

(g) Removing a restrictive endorsement from a check tendered for less than the full amount of a debt is not a bar to an action to collect the rest of the debt where there has been no prior agreement between debtor and creditor that acceptance of the partial payment would satisfy the entire debt. *Lowrance*, 866 F.2d 950.

19. Although there are no bona fide objective disputes as to the Bowlby and Commercial Vision claims, bona fide objective disputes existed between West Side and Franklin Boulevard as of the Petition Date and still exist. Therefore Franklin Boulevard does not have the requisite standing under 11 U.S.C. § 303(b)(1), and the involuntary petition must be dismissed. *See Busick*, 831 F.2d at 750; *In re B.B.S.I.*,

---

**2.** "It is unclear whether Illinois law authorizes a creditor to reserve rights to a debt by adding an

endorsement...." *Lowrance*, 866 F.2d at 954 n. 2.

*Ltd.,* 81 B.R. 227, 230 (Bankr.E.D.N.Y. 1988); *In re Ross,* 63 B.R. 951, 961–62 (Bankr.S.D.N.Y.1986); *In re Beacon Reef Ltd. Partnership,* 43 B.R. 644 (Bankr.S.D. Fla.1984); *Matter of Investment Corp. of North America,* 39 B.R. 758 (Bankr.S.D. Fla.1984); *Matter of Win–Sum Sports, Inc.,* 14 B.R. 389 (Bankr.D.Conn.1981).

### *Insolvency of West Side as of the Petition Date*

20. The Petitioning Creditors have satisfied the requirements of § 303(h)(1). The test set forth in § 303(h)(1) for granting an involuntary petition is that "the debtor is generally not paying such debtor's debts as debts become due." This test, which looks to equitable insolvency rather than balance sheet insolvency, represents the most significant departure of the Bankruptcy Code from the Bankruptcy Act provisions dealing with involuntary bankruptcies. *See* H.Rep. No. 95–595, 95th Cong., 1st Sess. (1977) pp. 323–24; S.Rep. No. 95–989, 95th Cong., 2d Sess. (1978) p. 34; 1978 U.S.Code Cong. & Ad.News 5787, 6279–80, 5820; *Win–Sum Sports,* 14 B.R. at 391.

21. While Congress was not explicit regarding what factors should be considered in applying the "generally not paying" test, it is clear that the test was not intended to be applied mechanically. *See In re B.D. International Discount Corp.,* 701 F.2d 1071, 1076 (2d Cir.1983), *cert. denied,* 464 U.S. 830, 104 S.Ct. 108, 78 L.Ed.2d 110 (1983); 2 *Collier on Bankruptcy,* § 303.12 (15th ed. 1988). Instead, Congress intended the test to be applied with flexibility so as not to limit or restrict the involuntary process. *In re All Media Properties, Inc.,* 5 B.R. 126, 142–43 (Bankr.S.D.Tex.1980). *See generally, McCoid, The Occasion for Involuntary Bankruptcy,* 61 Am.Bankr. L.J. 195 (1987).

22. In applying the "generally not paying" test, courts have developed a two-step inquiry. The first step is to determine whether a debt should be included as a debt in the "generally not paying" calculation. *See In re R.N. Salem Corp.,* 29 B.R. 424, 428 (D.S.D.Ohio 1983).

23. Once a court has determined that there are debts a debtor is not paying as they become due, a court engages in the second step of the inquiry. That step requires a court to compare the number and amount of unpaid debts with the number and amount of paid debts. That comparison is to take into account the materiality of that nonpayment as well as a debtor's general conduct of its financial affairs. *See In re Ramm Industries, Inc.,* 83 B.R. 815, 824 (Bankr.M.D.Fla.1988); *In re Taylor,* 75 B.R. 682, 684 (N.D.Ill.1987); *In re The Leek Corporation,* 52 B.R. 311, 314 (Bankr.M.D.Fla.1985); *In re Reed,* 11 B.R. 755, 760 (Bankr.S.D.W.Va.1981).

24. This second step of the inquiry has been alternatively formulated as requiring the court to examine whether a debtor has regularly missed a significant number of payments to creditors or has regularly missed payments which are significant in amount in relation to the size of a debtor's operation. The more creditors there are, the larger the number of missed payments to creditors that are required for involuntary relief. *All Media Properties,* 5 B.R. at 143.

25. It is fundamental that the determination of whether the debtor is generally paying such debtor's debts as such debts become due must be made as of the date of filing the petition. *Matter of Bishop, Baldwin, Rewald, Dillingham & Wong, Inc.,* 779 F.2d 471, 475 (9th Cir. 1985); *In re Laclede Cab Co.,* 76 B.R. 687, 691 (Bankr.E.D.Mo.1987); *In re Vincent J. Fasano, Inc.,* 55 B.R. 409, 417 (Bankr.N.D. N.Y.1985); *Win–Sum Sports,* 14 B.R. at 391; *All Media Properties,* 5 B.R. at 144.

26. Mere failure of a creditor to demand payment of a debt does not excuse failure to pay it. *All Media Properties,* 5 B.R. at 145.

27. (a) In this case, apart from debts due to the Petitioning Creditors, West Side was generally not paying its debts as they became due. Generally "not paying debts" includes regularly missing a significant number of payments to creditors or regularly missing payments which

are significant in amount in relation to the size of the Alleged Debtor's operation. *In re All Media Properties, Inc.*, 5 B.R. at 143.

(b) In deciding whether the Alleged Debtor is not paying its debts as they become due, the Court should consider the timeliness of the payment of past due obligations, the amount of debts long overdue, the length of time during which it has been unable to meet the large debts owed and the Alleged Debtor's deficit financial situation. *See Matter of Gill Enterprises, Inc.*, 15 B.R. 328 (Bankr.D.N.J.1981). In the matter at hand, the accounts payable ledger of the Alleged Debtor shows that hundreds of accounts in large amounts, the vast majority of accounts payable, were 120 days or older as of the date the involuntary petition was filed. Furthermore, when the involuntary petition was filed the Alleged Debtor had no professional liability insurance coverage, nor did it fund a self-insurance trust fund for such liability purposes. The Alleged Debtor also failed to meet its own payroll tax obligations for the first quarter of 1989 and failed to meet payroll tax obligations for the fourth quarter of 1988 which were filed under the name of Franklin.

(c) Even under the most stringent of tests, it is clear that the Alleged Debtor was not paying its debts as they came due, considering the number of debts, the amount of delinquency, the materiality of non-payment and nature of the debtor's conduct of its financial affairs. *In re Garland Coal and Mining Company*, 67 B.R. 514 (Bankr.W.D.Ark.1986). The accounts payable ledger of the Alleged Debtor lists in graphic detail the total number of debts and demonstrates the fact that a large majority of all claims were over 120 days old. Failure on the part of the Alleged Debtor to fund its self-insurance trust and pay taxes is indicative of its difficulties in handling its financial affairs. The Petitioning Creditors adequately investigated whether West Side was or not generally paying its debts when due on or about the Petition Date. In alleging that it was not doing so they were correct.

28. Based on the foregoing, West Side has established that the involuntary petition should be dismissed. The petition was filed absent the fulfillment of the requirements of § 303(b)(2) because one of the three petitioning creditors is subject to objective bona fide disputes, although all other requisite elements were established.

### Asserted "Bad Faith"

29. West Side has requested fees, expenses, and damages under the provisions of 11 U.S.C. § 303(i):

(i) If the court dismisses a petition under this section other than on consent of all petitioners and the debtor, and if the debtor does not waive the right to judgment under this subsection, the court may grant judgment—

(1) against the petitioners and in favor of the debtor for—

(A) costs; or

(B) a reasonable attorneys fee; . . . .

(2) against any petitioner that filed the petition in bad faith, for—

(A) any such damages proximately caused by such filing; or

(B) punitive damages.

30. The legislative history of § 303(i) shows that the use of the term "or" is not exclusive in this paragraph. *Better Care*, 97 B.R. at 410. A court may grant any and all of the damages provided for under this provision. *Id.* (quoting H.Rep. No. 95–595, 95th Cong., 1st Sess. (1977) p. 324; S.Rep. No. 95–989, 95th Cong., 2d Sess. (1978) p. 34, 1978, U.S.Code Cong. & Ad.News, 5787, 6280, 5820 (1978)). *See also In re Fox Island Square Partnership*, 106 B.R. 962, 966 (Bankr.N.D.Ill.1989); *In re Johnston Hawks, Ltd.*, 72 B.R. 361, 366 (Bankr.D.Hawaii 1987); *In re Camelot, Inc.*, 25 B.R. 861, 868 (Bankr.E.D.Tenn.1982), *aff'd*, 30 B.R. 409 (D.E.D.Tenn.1983); *Matter of Ramsden*, 17 B.R. 59, 61 (Bankr.N.D.Ga. 1981); 11 U.S.C. § 102(5).

31. If the court finds bad faith, it is empowered to award the entire panoply of damages listed in § 303(i). However, an award of such costs, fees and damages is not automatic but is within discretion of

the court. *Fox Island,* 106 B.R. at 966; *Better Care,* 97 B.R. at 410; *Johnston Hawks,* 72 B.R. at 366; *In re Advance Press & Litho, Inc.,* 46 B.R. 700, 701 (D.Colo.1984).

32. Clearly, a finding of bad faith is necessary for the award of any damages under § 303(i)(2). *Better Care,* 97 B.R. at 410; *Camelot,* 30 B.R. 410–11.

33. Unlike § 303(i)(2), § 303(i)(1) does not require a bad faith finding. *Fox Island,* 106 B.R. at 967. Few courts, however, have assessed costs and attorneys fees pursuant to § 303(i)(1) absent a bad faith finding. *Id. See also In re Allen Rogers and Co.,* 34 B.R. 631 (Bankr.S.D.N.Y.1983); *Camelot,* 25 B.R. 861.

34. In defining bad faith, courts have taken various approaches. One line of authority finds bad faith to exist on an objective basis where the filing of the petition was motivated by ill will, malice or for the purpose of embarrassing or harassing the debtor. This is the "improper purpose" test. *See Basin Electric Power Cooperative v. Midwest Processing Company,* 769 F.2d 483, 487 (8th Cir.1985) *cert. denied,* 474 U.S. 1083, 106 S.Ct. 854, 88 L.Ed.2d 894 (1986); *Fox Island,* 106 B.R. at 967; *Better Care,* 97 B.R. at 410; *United States Fidelity & Guaranty Co. v. DJF Realty & Suppliers,* 58 B.R. 1008, 1011–12 (N.D.N.Y. 1986); *Allen Rogers,* 34 B.R. at 633; *In re SBA Factors of Miami, Inc.,* 13 B.R. 99, 100 (Bankr.S.D.Fla.1981).

35. "An improper use of the Bankruptcy Code justifying a finding of bad faith will exist anytime a creditor uses an involuntary bankruptcy to obtain a disproportionate advantage to that particular creditor's position, rather than to protect against other creditors obtaining such a disproportionate advantage. This is especially true where the petitioning creditor could have obtained that advantage in an alternative forum." *Better Care,* 97 B.R. at 411 (creditors filed involuntary petition in bad faith and, thus were liable for damages where evidence indicated that creditors intended to shut down debtor's business because of personal antipathy for debtor); *see also In re F.R.P. Industries,*

*Inc.,* 73 B.R. 309, 313 (Bankr.N.D.Fla.1987) (true motive was to use the Bankruptcy Code as a means of effectuating a takeover of business that it has become profitable); *In re Wavelength, Inc.,* 61 B.R. 614, 620 (9th Cir.B.A.P.1986) (petition filed as a part of jockeying for position of corporate control).

36. Other courts combine both approaches and use a two-part test. *Fox Island,* 106 B.R. at 967 [adopting the *In re Turner,* 80 B.R. 618 (Bankr.D.Mass.1987) objective and subjective standards required under Bankruptcy Rule 9011)]; *Better Care,* 97 B.R. at 411); *United States Fidelity,* 58 B.R. at 1011–12. In *Turner,* the court observed:

> Rule 9011 appears to be all-encompassing in the indicia of bad faith which it sets forth, including a significant objective requirement bearing on the legal justification of a claim or defense: a reasonable inquiry into the facts and the law. It is therefore logical to adopt its standards in a § 303(i)(2) case in order to avoid conflicting standards.... Use of the Rule 9011 standards as the measure of bad faith under § 303(i)(2) would, furthermore, be consistent with the standards of bad faith developed by the courts for the dismissal of a voluntary petition under 11 U.S.C. § 1112, where courts have created a bad faith ground for conversion or dismissal even though it is not one of the grounds listed in the statute....

*Turner,* 80 B.R. at 623.

37. Rule 9011 proscribes conduct undertaken "for any improper purpose, such as to harass, to cause delay, or to increase the cost of litigation." "Rule 9011, of course, also encompasses the taking of inadequately supportable positions." *Better Care,* 97 B.R. at 411. In determining the legal sufficiency of a position under Rule 9011 a party must investigate the facts and law prior to the signing and submission of a pleading. *Id.* (citing *In re McDonald Trucking Co., Inc.,* 76 B.R. 513, 516 (Bankr.W.D.Pa.1987)).

38. In this case, the Petitioning Creditors have exhibited no bad faith under either of the above standards. Under the

improper purpose test, it is clear that none of the Petitioning Creditors were motivated by ill will and malicious intent. With respect to the improper use test, none of the Petitioning Creditors viewed or used the filing of the involuntary petition merely as a convenient method of debt collection. The Petitioning Creditors properly used the Bankruptcy Code as an attempt to liquidate West Side in an orderly fashion without preference to selective creditors, all in the face of massive nonpayment of West Side's debts as those debts came due.

39. There is a presumption of good faith in favor of a petitioning creditor in an involuntary proceeding and the Alleged Debtor had the burden of proving bad faith. *United States Fidelity*, 58 B.R. at 1011.

40. The record does not show bad faith in the combination of the three Petitioning Creditors to file the involuntary petition. The mere fact that one petitioning creditor sought out others to join in an involuntary bankruptcy petition does not give rise to finding of bad faith on the part of the petitioning creditor. *United States Fidelity*, 58 B.R. at 1012. In this case, there was no fraud or false statements made in seeking additional petitioning creditors by Franklin Boulevard. In addition, Franklin Boulevard knew that it had not been paid, and knew that other creditors were not being paid when it solicited the other creditors to join with it.

41. Under the Rule 9011 test, the Petitioning Creditors and their counsel made reasonable inquiry into the existence of the elements necessary for filing an involuntary petition. Although Franklin Boulevard's claim is found to be disputed, its evidence was strong.

42. Under the circumstances established here as recited in the Findings and Conclusions hereinabove, by separate order entered this date:

(a) the Involuntary Petition is dismissed;

(b) the request of West Side for sanctions under Bankruptcy Rule 9011 is denied;

(c) the request of West Side for fees, damages, and costs under 11 U.S.C. § 303(i)(2) for asserted bad faith filing is denied; and

(d) the request of West Side for costs and fees under 11 U.S.C. § 303(i)(1) is, in the discretion of this Court, denied.