In re Robert J. REVELEY,
Alleged Debtor.

In re James E. FUSCO, Alleged Debtor.

In re William M. FOLBERTH,
III, Alleged Debtor.

In re Nicholas W. KAUFMANN,
Alleged Debtor.

Bankruptcy Nos. 91–11262 (TLB)
to 91–11265 (TLB).

United States Bankruptcy Court,
S.D. New York.

Dec. 28, 1992.

Baer Marks & Upham by Howard Graff, Neal S. Barlia, New York City, for alleged debtors.

Kelley Drye & Warren by Kenneth A. O'Brien, Jr., Nicholas J. Dicarlo, New York City, for Whirlpool Financial Corp.

Sidley & Austin by Richard T. Peters, Henry L. Mason, Los Angeles, CA, Sidley & Austin by David F. Graham, Chicago, IL, for BSI.

Hahn & Hessen by Gabriel B. Schwartz, Anthony C. Acampora, New York City, for First American Bank of N.Y.

### DECISION ON ALLEGED BAD FAITH UNDER § 303(i)

TINA L. BROZMAN, Bankruptcy Judge.

Three creditors, Whirlpool Financial Corporation ("WFC"), First American Bank of New York ("FABNY"), and BSI–Banca della Svizzera Italiana ("BSI") (collectively, "Petitioning Creditors"), set in motion a lengthy course of litigation when they filed involuntary bankruptcy petitions under 11 U.S.C. § 303 against Robert Reveley, James Fusco, William Folberth III, and Nicholas Kaufmann (the "Alleged Debtors"), all of whom are partners in a particular enterprise. The Alleged Debtors moved to dismiss the involuntary petitions pursuant to 11 U.S.C. § 303(b)(1), Bankruptcy Rule 1011 and Rule 12(h) of the Federal Rules of Civil Procedure on the grounds that the claim of each of the Petitioning Creditors is subject to a *bona fide* dispute and therefore the Petitioning Creditors lacked standing to file the petitions against the Alleged Debtors. With the agreement of the parties, an initial hearing was conducted with respect to the claim of WFC only. Finding that its claim was subject to bona fide dispute, I dismissed the petitions because no additional creditors had intervened, as a result of which the number of qualified petitioning creditors was insufficient to meet the statutory mandate.

I subsequently bifurcated the proceedings under 11 U.S.C. § 303(i)(1) and (2), denominating the latter as an adversary proceeding under Fed.R.Bankr.P. 9014. (I did this to impose some order since the Alleged Debtors indicated that they intended to seek damages in the magnitude of $160,000,000.) The Alleged Debtors thus filed a pleading to which the Petitioning Creditors responded. At a pretrial conference and with the concurrence of the Petitioning Creditors, I determined to deal first with the issue of attorneys' fees and expenses. Following an evidentiary hearing, I awarded attorneys' fees and expenses pursuant to section 303(i)(1)[1] and ordered the bifurcation of liability and damages for the purposes of the trial on bad faith.

Shortly after the close of the Alleged Debtors' case in chief on liability, I accepted the negotiated settlement and dismissal of all claims asserted by the Alleged Debtors against FABNY. The trial resumed with respect to BSI and WFC. This decision deals only with the Alleged Debtors' contention that BSI and WFC filed the involuntary petitions in bad faith. Should I determine that the petitions were filed in bad faith, as the Alleged Debtors contend, they will then seek an additional award of professional fees, costs, and expenses incurred in connection with the proceedings subsequent to dismissal of the petitions; all damages proximately caused by the filing of the petitions; punitive damages; and

---

**1.** The Petitioning Creditors did not challenge the Alleged Debtors' entitlement to attorneys' fees; the sole objection was to the reasonableness of the fees sought.

cancellation of the indebtedness allegedly owed by each Alleged Debtor to each Petitioning Creditor.[2]

## I.

Each of the Alleged Debtors is a general partner of Metropolis Capital Group ("MCG"), a New York partnership specializing in nationwide real estate development, which purchases and operates its real estate projects through affiliated corporations and partnerships. Among the partnerships is Cannery Park I and II Associates, L.P. ("Cannery Park"), a California limited partnership in which each of the Alleged Debtors is a beneficial interest holder.

### WFC's Debt

Pursuant to a loan and security agreement dated December 27, 1989, WFC made two term loans each of $3.04 million to Cannery Park. These loans were evidenced by two notes of the same date which were to mature on March 31, 1991. The Alleged Debtors executed limited guarantees also of the same date in which they guaranteed certain percentages of the obligations of Cannery Park to WFC. At some point, the notes were returned by WFC to Cannery Park marked "Paid." Cannery Park executed two new notes dated April 1, 1990, but actually signed three days later, each in the principal amount of $3,120,097 and carrying a maturity date of June 1, 1990. No new guarantees were issued by the Alleged Debtors.

### WFC Sues the Alleged Debtors

On September 19, 1990, WFC demanded payment from the Alleged Debtors under the limited guarantees. The Alleged Debtors refused to comply. The following month, WFC commenced an action in the Illinois federal district court claiming that the Alleged Debtors had defaulted on their obligations under the limited guarantees (the "Illinois action"). In their answer, the Alleged Debtors contested the allegations contained in the Illinois complaint and raised several counterclaims and affirma-

tive defenses. WFC moved to strike the affirmative defenses on the theory that they failed to state claims as a matter of law. The Alleged Debtors countered with a motion to stay the Illinois action pending the resolution of a California foreclosure action which WFC had commenced against Cannery Park and MCG (the "California action"). In that action, the Alleged Debtors, through their status as general partners of MCG, asserted virtually the identical defenses and counterclaims pleaded in the Illinois action on the guarantees. At the time that the involuntary petitions were filed, both these motions were *sub judice.*

### FABNY's Debt

In November 1988, FABNY had granted MCG a $5 million line of credit partially secured by the pledge of a $3 million certificate of deposit and guaranteed by the Alleged Debtors. In 1990, in utilization of this line of credit, MCG had executed two promissory notes for $2.5 million each. The first was payable on September 10, 1990 and the second on November 1, 1990. On September 25, 1990, MCG advised FABNY that it would be unable to meet these scheduled maturity dates. On October 3, MCG consented to the setoff of its $3 million certificate of deposit against the outstanding debt to FABNY.

### BSI's Debt

In October 1989, BSI loaned Metropolis Seaport Associates ("MSA"), another of the MCG affiliates, $3 million which was secured by a letter of credit issued to BSI by Bankers Trust Co. (the "Bankers Trust LOC"). Additional loans of $3 million and $4 million were made to MCG in January and April 1990. These loans were secured by cash balances maintained at BSI as well as by the Alleged Debtors' guarantees and personal assets, including cash and marketable securities held by Reveley and Fusco in separate accounts at Boston Safe Deposit & Trust Co. ("Boston Safe").

### MCG's Cash Flow Difficulties are Revealed

In June 1990, MCG informed BSI that due to cash flow constraints MCG would

---

**2.** The Petitioning Creditors contend that the last form of relief requested is not authorized by

section 303(i) of the Bankruptcy Code.

have difficulty making interest payments of approximately $200,000 due July 1. MCG requested that it be permitted to use some of the $500,000 cash collateral on deposit at BSI to offset the July interest payment on the BSI loans. BSI declined the request and instead asked the Alleged Debtors to supply personal financial statements as had been contemplated in the loan documents.

A week later the Alleged Debtors asked BSI's consent to substitute two unsecured MCG receivables for the marketable securities held as collateral in the Boston Safe accounts. BSI was not satisfied with the proposed substitution of receivables and instead proposed that a second mortgage on another MCG property (the "John Jay property") become part of the collateral package. However, no agreement was reached at that meeting and the collateral was never substituted.

BSI subsequently learned that Reveley and Fusco had already withdrawn some securities and cash from the Boston Safe collateral in June, prior to their request to BSI to permit them to do so.[3] Concerned about the increased exposure on the loans, BSI sought once again to obtain substitute collateral. When no substitute collateral was provided, BSI declared the loans in default. BSI then consulted Sidley & Austin, bankruptcy counsel; a series of workout negotiations with the Alleged Debtors began in September and continued for some months.

*Initial Workout Efforts*

The first workout meeting between MCG and BSI was held on September 10. The purpose of the meeting was to discuss MCG's overall financial situation and the possibility of BSI's taking additional collateral. Reveley disclosed at that meeting that a $10 million financing package to complete a project in San Jose, owned by Cannery Park, had been declined, forcing a cut back in operations there. He reported that operating capital in New York was severely strained, making it impossible for MCG to meet its payroll. Thus, he again requested the release of $400,000, the bal-

ance of the BSI collateral. BSI refused to consider the release of this collateral without substitute collateral being put forward, primarily a second mortgage on MCG's John Jay property.

While at this first session, Reveley also explained that although many of MCG's projects were cash flow positive (the so-called Huntsville, Santa Rosa and New Seabury projects), others represented cash flow drains, so that in the aggregate, MCG's cash flow could not cover its senior debt. Reveley expressed concern that the resulting defaults could trigger involuntary bankruptcy filings. MCG and BSI also discussed the possibility of a three year plan requiring funding from BSI. BSI refused to consider providing new funds, however, until it received substitute collateral for its existing loan. BSI requested that it meet with MCG's other creditors.

On September 20, BSI offset the remaining cash collateral against MCG's outstanding balance. It refrained, however, from presenting the Bankers Trust LOC. MCG had requested that it not call the LOC as the Joint Industry Board ("JIB"), which held a first mortgage on the John Jay property, was anxious that it not be called. (Calling the LOC could have precluded the ability of the Alleged Debtors to obtain the JIB's consent to the grant to BSI of a second mortgage on the John Jay property.) On this same day, MCG informed BSI that it had retained the firm of Zolfo Cooper & Co. to assist it in composing a workout plan which it anticipated would take 30 to 60 days to develop.

On September 25, BSI met with MCG and Nordbanken, another primary unsecured lender to MCG, formerly known as PKbanken, at a meeting arranged by MCG. (Between June 1988 and February 1990, Nordbanken had made loans to MCG in the aggregate amount of approximately $16 million, a percentage of which were guaranteed by the Alleged Debtors and were in default.) The banks received updated information on the Cannery Park project including the fact that $10 million was re-

---

**3.** BSI later brought suit against Boston Safe based on the alleged improper withdrawals.

quired to complete tenant improvements, that a $6 million loan from WFC was in default, that Pacific Pioneer Bank held a $4.5 million first mortgage and that $800,-000 in construction liens had been filed against the property. Fusco stated that MCG currently had no mechanism to pay off the liens and complete the improvements and that MCG was considering filing a Chapter 11 petition for the partnership owning Cannery Park.

This was not the total of the information imparted to the banks. They were also informed about other projects in San Jose in which an insurance company had filed a notice of foreclosure, that a second mortgage to California Business Bank of $750,-000 was due and that $50,000 of interest was in arrears. MCG explained that given the real estate environment at that time, forced sales would result in significant equity losses whereas if a three year plan could be successfully negotiated, creditors might well be repaid. Reveley gave the banks a revised estimate that a final plan would be available in 60 to 90 days.

BSI again pressed for a proposal which would provide additional collateral and an acceptable payment schedule. Without these conditions being satisfied, BSI said it would be forced to call the Bankers Trust LOC and commence actions against both MCG and the Alleged Debtors.

Upon request of the banks, MCG provided a preliminary draft of a schedule of its institutional lenders which revealed direct liabilities and accrued interest of MCG totaling $38.8 million. Debt and accrued interest of other MCG entities totaled $51.3 million. However, the schedule did not include all project debts but was limited to those for which the loan documents had been reviewed. MCG agreed to provide an updated schedule of debt and an updated estimate of the values of its properties by the following Thursday. However, no complete schedule was provided.

At a meeting on October 10, MCG informed the banks that it had retained Schulte Roth as bankruptcy counsel and presented the banks with a six week time-table by which it would provide components of the business plan. MCG also informed the banks that it had just finished meeting with a third bank, FABNY, and that FABNY would be calling BSI to schedule a meeting.

*FABNY Joins the Workout Negotiations*

In September, FABNY had learned that the Alleged Debtors had understated the amount of their personal guarantees to Nordbanken and BSI. On October 16, FABNY joined in the negotiations with the Alleged Debtors, BSI and Nordbanken. At this meeting, FABNY learned that the Alleged Debtors had also understated the amount of their outstanding personal guarantees to WFC.

Throughout the course of two meetings at the end of October, MCG presented a revised draft workout plan to the banks containing a debt matrix and a schedule of personal guarantees and corporate contingent liabilities. Compared to the information that had been provided by MCG in September, for each project there was a significant variance in asset value and some variance in liabilities, which had been understated previously.

The short term cash flow statement that was provided by MCG was dependent on a partial release of the remaining cash collateral held by Nordbanken and BSI which neither bank had agreed to release and which each had refused to release in the past. In total the plan sought $13 million of additional funding by the banks as an alternative to a voluntary bankruptcy filing by MCG.

MCG also disclosed the possible $9 million personal tax liability of Reveley and Fusco resulting from a $25.5 million gain on the sale of Phase I of the John Jay property unless a qualified replacement property was acquired to defer recognition of income. If this liability were not deferred, it would be "behind" the secured first lender, Mutual of New York, which held a $23.4 million mortgage but in "front of" the unsecured lenders, BSI, Nordbanken and FABNY.

Around this time BSI learned that WFC had brought the Illinois action to collect on

the personal guarantees executed by the Alleged Debtors and MCG in connection with the loan to Cannery Park. It was a little later that same month that WFC filed the California action seeking to foreclose on the Cannery Park project. BSI was also informed about previously undisclosed encumbrances on MCG's project in New Seabury, and of MCG's intent to transfer its interest in the Huntsville apartment project. Both projects were properties that BSI had hoped would be provided as substitute collateral for its loan. Alarmed about the potential transfers of these properties, BSI requested that MCG and the Alleged Debtors obtain its approval before undertaking any asset transfers.

At a meeting with bankruptcy counsel on October 25, BSI was advised of the option and benefits of filing involuntary bankruptcy petitions against either MCG or the guarantors. Neither MCG nor the Alleged Debtors had agreed to sign the standstill agreement proposed by the banks to protect against the transfer of assets. BSI was concerned that financial information was being withheld and that future asset transfers were contemplated.

At a meeting on October 30, MCG provided a large binder of financial information which the banks found "essentially useless." In particular, the personal financial statements were incomplete and failed to give current values on most assets.

The Alleged Debtors' proposed revision to the standstill agreement was seen by the banks as inadequate to prevent future transfers as it simply provided for a seven day notice period prior to the transfer of any asset whose net proceeds exceeded $1 million. Frustrated with their inability to obtain reliable information as to the value of MCG's assets and the results of its operations, and concerned about the weak updated personal financial statements, possible transfers of assets and the absence of collateral offered to secure existing exposure, FABNY, BSI, and Nordbanken agreed at a November meeting to file involuntary Chapter 11 petitions against both MCG and its general partners.

Nordbanken, which had previously discussed the possibility of providing additional financing to MCG, was no longer willing to do so without the protection of Chapter 11. By this time, Nordbanken had already received its audit committee's approval to proceed with the filing of the involuntary and FABNY was scheduled to present the bankruptcy proposal to its committee that week.

On November 13, a meeting was held with the banks and MCG to discuss the planned bankruptcy filing. The Alleged Debtors' counsel, Mr. Korff, laid out the disadvantages to MCG and the Alleged Debtors of a bankruptcy filing. FABNY, however, felt that these "disadvantages" would actually benefit the banks.

MCG then renewed its request for additional funding and asked that $4 million in new money be lent directly to MCG in order to allow it to operate for one year. MCG offered collateral consisting of MCG's interest in three projects and two plots of land in California to secure the new loan. The banks found the proposal unacceptable primarily because it failed to secure their existing combined $25 million of unsecured debt. Instead the banks drafted a counterproposal. When MCG failed to respond with a satisfactory proposal, the banks continued to pursue the filing of the involuntary bankruptcy.

*Nordbanken Withdraws From the Negotiations*

Subsequently Nordbanken retained Coudert Brothers in a last effort at an out-of-court workout. Nordbanken presented a proposal to BSI and FABNY whereby the banks would create a special purpose corporation to purchase MCG's interest in two projects, Santa Rosa and New Seabury. After meeting with MCG, certain revisions to this proposal were discussed including the addition of $2 million in "walking away" money to MCG and the possibility of including WFC in the buyout proposal. Ultimately, however, the parties failed to reach agreement on the terms of the workout. BSI was informed in January that Nordbanken was unwilling to pursue further workout negotiations or bankruptcy

and that it intended to commence its own action against MCG and the Alleged Debtors. On February 26, Nordbanken filed suit in New York against MCG and its partners for more than $17 million.

*Involuntary Bankruptcy Is Explored*

BSI, concerned with the possibility of additional lawsuits being filed against the Alleged Debtors, consulted with bankruptcy counsel and was advised to go forward with the bankruptcy option. First drafts of the petitions were circulated at the end of January. Because Nordbanken was out of the picture, BSI and FABNY needed a third creditor to join in the filing.

*WFC Joins the Discussions*

WFC first considered joining with BSI and FABNY as a petitioning creditor after Sidley & Austin communicated with WFC's counsel during the second week of February, 1991. (During the course of the workout negotiations with BSI and FABNY, WFC's loan had appeared on the debt matrices submitted by MCG, and in December, the Alleged Debtors had included WFC among the lenders whose guarantees could reach either MCG or the Alleged Debtors.)

A series of meetings was held on February 27. The first meeting was attended by BSI and FABNY (and Sidley & Austin). FABNY's in-house counsel, Corcoran, expressed reluctance at pursuing the involuntary petitions because he felt that there was nothing available to recover and was concerned about the expense. However, the banks concluded that as they were both unsecured and unwilling to lend additional funds to MCG because MCG had taken no steps to secure the existing loans, to provide adequate financial disclosure or to proffer a reasonable workout proposal, continuing to negotiate without the threat of bankruptcy would be a waste of time.

BSI and FABNY then met with MCG's counsel and business consultant, Korff, for an update on MCG's situation and negotiations with its other creditors. Upon being informed of the banks' intention to file involuntary petitions, Korff requested that they wait one week for him to take one last stab at working out the problems with and securing financing from Nordbanken. The banks agreed to wait. Korff also informed the banks that WFC's claims against the Alleged Debtors were being contested, noting that an answer had been filed and affirmative defenses raised in the Illinois action.

Korff then left and WFC joined the meeting. Counsel for WFC discussed the defenses raised by the Alleged Debtors to WFC's claim and dismissed them as meritless. He suggested, however, that a fourth creditor be sought to join the petitions in the event WFC were disqualified because its claim were determined to be subject to a *bona fide* dispute. The Petitioning Creditors agreed to pursue the filing of the involuntary cases against the Alleged Debtors but decided to hold off until Korff could report back to them on March 7.

*The Involuntary Petitions Are Filed*

Korff was unsuccessful in obtaining additional financing from Nordbanken as a result of which the Petitioning Creditors filed the involuntary petitions on March 22.

## II.

BSI contends that it filed the involuntary petitions for proper purposes, within the meaning of the Code, including: (1) to bring about an orderly workout among the various creditors of the Alleged Debtors; (2) to stay litigation and other enforcement actions that had been or were about to be instituted by creditors individually; (3) to prevent transfer or dissipation of the Alleged Debtors' assets; and (4) to obtain financial information necessary to permit an orderly financial restructuring under a plan of reorganization. BSI points out that despite more than six months of discussions with the Alleged Debtors, no progress had been made on an out-of-court restructuring or resolution of the amounts owed to BSI; that requests for current and reliable information had not been honored; that Nordbanken had withdrawn from the restructuring negotiations and had filed suit against MCG and its partners; that by the Alleged Debtors' own admissions they had guaranteed more than $61 million in

outstanding loans to the MCG entities and almost all the MCG entities were either in default or shortly would be in default to senior lenders; that Reveley and Fusco had withdrawn, without authorization in BSI's view, more than $1.6 million of securities pledged as collateral for BSI's loans; and that the Alleged Debtors had failed to provide any reliable assurances that additional asset transfers would not occur.

Further, BSI argues that in pursuing the involuntary bankruptcies and in considering the propriety of WFC's joinder in the petitions, BSI relied heavily on the advice of its legal counsel, the material supplied by WFC and its lawyers, and WFC's verifications and signing of the petitions. Having obtained the pleadings pertaining to WFC's Illinois action against the Alleged Debtors, BSI's attorneys independently analyzed that litigation and concluded that the asserted defenses to WFC's claim were insufficient to raise a *bona fide* dispute and did not render WFC's joinder in the petition improper.

WFC similarly argues that its filing was proper because it filed the petitions to prevent dissipation of the Alleged Debtors' assets, to provide for court-supervised administration and pro-rata distribution of those assets and to obtain reliable information concerning the Alleged Debtors' financial condition.

### III.

Petitioning creditors assume certain risks when filing involuntary bankruptcy petitions. Section 303(i) of the Bankruptcy Code allows the court to enter judgments against the petitioners when the involuntary petition is dismissed other than on consent of the parties or abstention by the court. Section 303(i) provides:

> (i) If the court dismisses a petition under this section other than on consent of all petitioners and the debtor, and if the debtor does not waive the right to judgment under this subsection, the court may grant judgment—
> (1) against the petitioners and in favor of the debtor for—
> (A) costs; or

> (B) a reasonable attorney's fee; or
> . . .
> (2) against any petitioner that filed the petition in bad faith, for
> (A) any damages proximately caused by such filing; or
> (B) punitive damages

11 U.S.C. § 303(i).

Petitioning creditors charged with bad faith filings pursuant to section 303(i)(2) have certain procedural advantages in their favor. First, there is a presumption of good faith on the part of the petitioners, and the objecting party has the burden of proving bad faith. *In re Cle Corp*, 59 B.R. 579, 583 (Bankr.N.D.Ga. 1986). Moreover, the burden is a heavy one, requiring proof by at least a preponderance of the evidence. *Id.; United States Fidelity & Guaranty Co. v. DJF Realty & Suppliers, Inc.*, 58 B.R. 1008, 1013 (N.D.N.Y.1986). An alleged debtor must prove separately bad faith by each petitioning creditor against whom it seeks an award of damages under § 303(i)(2). 2 L. King, *Collier on Bankruptcy*, ¶ 303.39, 303–139 (15th ed. 1992).

Because neither the Bankruptcy Code nor its legislative history provides a definition of bad faith, the courts were faced with "an empty chalice in the bad faith standard of § 303(i)(2) . . ." *In re Turner*, 80 B.R. 618, 622 (Bankr.D.Mass.1987). Thus, the emerging standards have been judicial creations. Not surprisingly, the courts have been less than uniform with respect to the bad faith standards applied. Some courts have based their bad faith evaluations on whether the petitioning creditors were motivated by spite, ill will or malice or for the purpose of harassing the debtor. *See In re Camelot, Inc.*, 25 B.R. 861 (Bankr.E.D.Tenn.1982), *aff'd sub nom. Camelot, Inc. v. Hayden*, 30 B.R. 409 (E.D.Tenn.1983) (court determined petitioners acted in bad faith where their purpose in bringing the petition was to forestall state dissolution proceeding); *In re Laclede Cab Co.*, 76 B.R. 687 (Bankr.E.D.Mo. 1987) (petitioning creditors acted in bad faith in filing the petition in order to force alleged debtor into labor negotiations).

Other courts have focused on whether the bankruptcy process was initiated for purposes otherwise legitimate, but inappropriate in light of the intended use of the Bankruptcy Code. *See In re SBA Factors of Miami Inc.*, 13 B.R. 99 (Bankr.S.D.Fla. 1981) (bad faith of petitioning creditors based on their use of the bankruptcy proceeding as a substitute for customary debt collection); *In re Allen Rogers & Co.*, 34 B.R. 631 (Bankr.S.D.N.Y.1983). Several courts have referred to these two approaches respectively as the "improper purpose" test and the "improper use" tests. *See In re Better Care, Ltd.*, 97 B.R. 405, 410 (Bankr.N.D.Ill.1989); *In re West Side Community Hosp. Inc.*, 112 B.R. 243 (Bankr.N.D.Ill.1990). The court in *Better Care* stated that

> [a]n improper use of the Bankruptcy Code justifying a finding of bad faith will ... exist any time a creditor uses an involuntary bankruptcy to obtain a disproportionate advantage to that particular creditor's position, rather than to protect against other creditors obtaining a disproportionate advantage. This is especially true where the petitioning creditor could have obtained that advantage in an alternate forum.

*Better Care*, 97 B.R. at 411. Whether termed improper use or improper purpose, these types of inquiries are primarily concerned with the petitioners' underlying reasons for filing the petitions. At least one court has noted that these two standards are not necessarily inconsistent and "seem to be different facets of the same concept." *Turner*, 80 B.R. at 623.

In contrast to courts that focus on the creditor's purposes for initiating an involuntary bankruptcy, some courts evaluate the manner in which the petition was filed. *United States Fidelity*, 58 B.R. at 1011 (the better practice is for bankruptcy courts to inquire into *both* the creditor's conduct and motives for filing the petition); *Basin Electric Power Cooperative v. Midwest Processing Co.*, 47 B.R. 903, 909 (D.N.D.1984), *aff'd*, 769 F.2d 483 (8th Cir. 1985), *cert. denied*, 474 U.S. 1083, 106 S.Ct. 854, 88 L.Ed.2d 894 (1986) (bankruptcy court erred by failing to consider subjective motivation as well as actual conduct of petitioning creditors in reaching a determination on the bad faith issue). This bad faith standard essentially asks whether a reasonable person in the situation of the petitioning creditor would have filed. *See In re Grecian Heights Owners' Asso.*, 27 B.R. 172 (Bankr.D.Or.1982) (petitioner acted unreasonably and thus in bad faith where he filed the petition despite advice by counsel to the contrary).

Recently, courts have evaluated bad faith by the subjective and objective standards contained in Rule 9011 of the Federal Rules of Bankruptcy Procedure. *See, e.g., In re Secured Equipment Trust of Eastern Airlines, Inc.*, 1992 WL 295943 (S.D.N.Y.1992); *In re KP Enterprise*, 135 B.R. 174 (Bankr.D.Me.1992); *Turner*, 80 B.R. at 622–23; *West Side*, 112 B.R. at 258; *Better Care*, 97 B.R. at 411; *In re Petralex Stainless Ltd.*, 78 B.R. 738, 743 (Bankr. E.D.Pa.1987). Rule 9011 tracks Rule 11 of the Federal Rules of Civil Procedure, which was promulgated to deter abuses in federal civil litigation. Byrne, *Sanctions for Wrongful Bankruptcy Litigation*, 62 Am. Bankr.L.J. 109 (1988). Rule 9011 provides in part:

> The signature of an attorney or a party constitutes a certificate that the attorney or party has read the document; that to the best of the attorney's or party's knowledge, information and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification or reversal of existing law; and that it is not interposed for any improper purpose, such as to harass, to cause delay, or to increase the cost of litigation.

Rule 9011 is composed of two prongs. The first prong prohibits attorneys and parties from filing suits without sufficient justification. This aspect of the rule is evaluated by a reasonableness standard. *Turner*, 80 B.R. at 623. The second prong of Rule 9011 proscribes actions undertaken for improper purposes. It appears that bad faith may be found if either improper motivation or inadequate investigation is demonstrat-

ed. Snyder, *Commercial Bankruptcy Litigation* § 5.14 at 5–82 (1990). The Rule 9011 standard appears to be all encompassing and seems to "ensure that all pertinent indicia of bad faith are explored." *KP Enterprise*, 135 B.R. at 180.

With respect to the improper purpose prong, courts have excused petitioners from a bad faith finding where the improper purpose was not the sole reason for the filing. *Petralex Stainless*, 78 B.R. 738 (court held that filing to circumvent a state court ruling is not per se improper, where petitioner also had legitimate reasons for filing); *Turner*, 80 B.R. at 627 (although creditors used bankruptcy petition partly to obtain "potential leverage," they were not in bad faith where they were primarily motivated by their legitimate goals).

■ The investigation requirement of the rule is designed to prevent frivolous filings. Byrne, *Sanctions for Wrongful Bankruptcy Litigation* at 114. To satisfy this prong of the rule, the petitioning creditors and their counsel must make a reasonable inquiry into the existence of the elements necessary for filing an involuntary petition. *See West Side Community Hosp.*, 112 B.R. at 259. Thus, there is no bad faith where the petitioners support their positions with reasonable arguments. *See Turner*, 80 B.R. at 625 (no bad faith under Rule 9011 standard where the petitioners had an arguable case); *West Side Community Hosp.*, 112 B.R. at 259 (although the court determined that one of the elements for involuntary filings was lacking, the petitioners had strong evidence to support their position).

■ On the other hand, where the petition is defective and the evidence shows that the petitioners conducted only a perfunctory investigation before filing, the court may find bad faith under the Rule 9011 standard. *See, e.g., Better Care*, 97 B.R. at 412 (pre-filing investigation amounted to no more than looking at a treatise and talking to a partner). Similarly, bad faith has been found where petitioners disregard facts which have an impact on the validity of their petition. *See In re Fox Island Square Partnership*, 106 B.R.

962, 968 (Bankr.N.D.Ill.1989) (petitioners acted in bad faith when they knew debt was highly disputed and knew or should have known that the debt was not owed by the alleged debtor but rather by a land trust); *In re McDonald Trucking Co.*, 76 B.R. 513, 519 (Bankr.W.D.Pa.1987) (creditor acted in bad faith by filing involuntary petition knowing it did not have the requisite number of petitioners).

■ Another factor considered by the courts is whether the petitioner relied upon poor legal advice. Where the petition is motivated by ill will or malice, reliance upon counsel's advice will not preclude a finding of bad faith on the part of the petitioner. *In re Advance Press & Litho, Inc.*, 46 B.R. 700 (D.C.Colo.1984). But where bad faith is founded upon unreasonable pre-filing inquiry, without malice on part of petitioner, courts appear to be divided as to whether reliance upon legal advice will excuse the petitioner from a bad faith finding. Some courts hold the petitioner responsible. *See In re Ramsden*, 17 B.R. 59 (Bankr.N.D.Ga.1981) (bad faith on part of petitioning creditor was found despite the fact that it was the attorney's inadequate inquiry that led to the improper filing); *In re Wavelength*, 61 B.R. 614 (9th Cir.BAP 1986); *SBA Factors*, 13 B.R. 99. Other courts, however, absolve the petitioner of liability in such cases. *See Better Care*, 97 B.R. at 412 ("where the attorney [erroneously] advises the client that his [otherwise legitimate] purpose should be effectuated by an involuntary bankruptcy, it is the attorney who is responsible for the improper use, not the client."). Even those courts which hold the petitioner liable for bad faith despite the absence of actual malice are divided as to whether punitive damages should be awarded against such petitioner. *See, e.g., SBA Factors*, 13 B.R. at 101 (although petitioners filed in bad faith, assessment of punitive damages would be inefficient deterrent where creditors acted upon poor legal advice); *McDonald Trucking*, 76 B.R. at 519 (punitive damages may be assessed against petitioning creditors who proceed in bad faith, even if they have

done so in reliance on counsel for the acts which resulted in the exhibited bad faith).

It is not necessary to enter the fray regarding the proper test to apply, for after listening to several days of testimony and reviewing the many exhibits received into evidence, I am convinced that the Petitioning Creditors have exhibited no bad faith whichever standard is utilized. Under the improper purpose test, it is clear that neither of the Petitioning Creditors was motivated by ill will or malicious intent. With respect to the improper use test, neither of the Petitioning Creditors viewed or used the filing of the involuntary petitions merely as a method of debt collection. On the contrary, the Petitioning Creditors' primary motivations in filing the involuntary petitions were to prevent any further dissipation of assets occurring either through collateralization agreements with other creditors or litigation and foreclosures instituted by other creditors and to obtain reliable financial information and control in an effort to facilitate an orderly workout among all the Alleged Debtors' creditors. These are legitimate, commercial purposes and do not constitute bad faith on the part of either BSI or WFC.

The Alleged Debtors contend that BSI's filing of the petitions contravenes the objective prong of the bad faith test derived from Rule 9011 in that: FABNY was not a proper party to the petitions; WFC's verifications of the petitions were fraudulent; and the WFC claim was subject to a *bona fide* dispute. As to WFC, the Alleged Debtors claim that it used the involuntary filing for improper purposes, to harass the Alleged Debtors, avoid a decision on the merits in Illinois action and coerce the Alleged Debtors to acknowledge and pay a disputed debt. The Alleged Debtors also argue that WFC fails the objective prong of the bad faith test because it did not conduct a reasonable investigation prior to filing the petition, including the failure to adequately investigate the Illinois answer and the Reveley and Fusco debts, and because its verifications executed by Catherine Midkiff were fraudulent.

**(i) FABNY's Motives**

We will begin the analysis of the Alleged Debtors' contentions with the assertion that FABNY was not a proper party in that it allegedly filed with the improper purpose of using the filing as a negotiating tactic to achieve a transfer of assets to benefit its position and then withdraw the petition. This, the Alleged Debtors say, was known to BSI and should have been sufficient for BSI to conclude that FABNY was an improper petitioning creditor. The Alleged Debtors also claim that BSI solicited FABNY in order to achieve this end—the transfer of assets to secure loans—which it knew could not be achieved through bankruptcy.

The Alleged Debtors' contention is bottomed on a few key factors, in particular a report of the February 27 meeting written by Ms. Smith of BSI in which she reported that Mr. Epling, from Sidley & Austin, stated that "the involuntary petitions could be withdrawn, but it serves to turn up the pressure on [MCG] to negotiate with us." Mr. Epling also explained at that meeting that without the threat of bankruptcy continuing negotiations would be a waste of time.

The Alleged Debtors made much of this meeting on February 27. Contrary to their assertions, however, BSI did not "solicit" FABNY at this meeting. FABNY had previously determined to pursue the bankruptcy option as early as November when Nordbanken contemplated joining the petitions. The February 27 meeting was merely the culmination of months of unsuccessful workout negotiations.

In addition, well before the petitions were filed and as early as the strategy meeting on October 25, Sidley & Austin had explained that any action taken in bankruptcy court is subject to approval of the bankruptcy judge and prior notification to all creditors. This notification requirement would obviously preclude any "side deals" favoring one creditor over another without the approval of the court.

As argued by the Alleged Debtors, Sidley & Austin was told on March 15 that FABNY had not been aware of the notice

requirements. However, according to Shelley Chapman of that law firm, whose testimony was straightforward and credible, Korff informed FABNY of the notice requirement at that time. FABNY did not sign off on the petitions until some days later.

■ Even assuming that a FABNY officer was under the misimpression, unknown to BSI, that he could strike a deal and simply withdraw the petitions, I could not impute this to show bad faith on the part of BSI. As BSI understood, FABNY was in a similar position to BSI as an unsecured creditor, and thus, had similar reasons for joining the petition. The record simply does not support the notion that FABNY was uninformed when it filed the involuntary petitions nor that, if it was so uninformed, BSI was aware of it. The mere fact that one petitioning creditor seeks out others to join in the filing of an involuntary petition does not give rise to a finding of bad faith on the part of the petitioning creditor. *West Side Community Hosp.*, 112 B.R. at 259 *citing United States Fidelity*, 58 B.R. at 1012. Here, as in *West Side*, there was no fraud perpetrated nor false statement made by BSI to FABNY in the course of discussions regarding the filing of the involuntary petitions.

The Alleged Debtors also failed to show that BSI was motivated by this asserted file/settle/withdraw strategy. In a memorandum of December 10 discussing the pros and cons of BSI's options, Ms. Smith, of BSI, reported the advantages and disadvantages of bankruptcy versus an action on the guarantees. Unlike the advantages of an action on the guarantees which could simply be withdrawn, withdrawal was not listed as an advantage to bankruptcy.

(ii) The Investigation of WFC's Claim

■ The Alleged Debtors claim bad faith on the part of both BSI and WFC for their failure to adequately investigate whether the WFC claim against the Alleged Debtors was subject to a *bona fide* dispute. Although I found that WFC's claim against the Alleged Debtors was subject to a *bona fide* dispute, both BSI and WFC performed adequate investigations regarding the Alleged Debtors' answer in the Illinois action and reasonably determined that the defenses asserted would not subject WFC to disqualification. Indeed, the primary theory which the Alleged Debtors espoused to defeat the claim in this court had never been raised in the Illinois (or California) action. I noted as much in my decision but explained that since the Illinois action was in its infancy, an amendment to the answer would probably be allowed.[4]

In February, BSI, through its counsel, Chapman, learned from WFC's attorneys that the Alleged Debtors had asserted defenses in the Illinois action. At the meeting on February 27, Mr. Stoddard, one of WFC's attorneys, characterized the defenses raised as "silly" and lacking merit. Chapman explained that she would conduct her own investigation and asked that the relevant documents be sent to her. After both Chapman and Epling analyzed the defenses asserted in the answer, Chapman advised BSI in March that, in Sidley & Austin's opinion, the claim of WFC was not subject to *bona fide* dispute under section 303 of the Bankruptcy Code. Both Chapman's and Epling's analyses of those de-

---

**4.** The importance of this theory (which, as argued, would relieve the Alleged Debtors of their guarantees but would not affect the liability of MCG or related, liable entities) was made plain by subsequent events. The California bankruptcy court in which an involuntary petition against Cannery Park was later filed concluded that Cannery Park's debt to WFC was not subject to *bona fide* dispute. Even absent the distinction between the theories articulated in the Illinois action and these cases, this California decision shows that reasonable people could differ on whether WFC's debts were disputed, as a result of which it would be wholly improper to conclude that the Petitioning Creditors exhibited bad faith in filing the petitions with WFC. *See generally Latham Sparrowbush Associates v. Cohoes Industrial Terminal, Inc. (In re Cohoes Industrial Terminal, Inc.)*, 931 F.2d 222, 227 (2d Cir.1991) (in order to impose a Rule 9011 sanction, a bankruptcy court must find that an attorney has submitted a claim that has no chance of success under existing precedents and that fails to advance a reasonable argument to extend, modify or reverse the law as it stands).

fenses were fully explained at trial and satisfied me that adequate investigation was undertaken. Based on its attorneys' advice, on March 13, BSI made a final determination to proceed with the involuntary petitions. *See Wavelength*, 61 B.R. at 620 ("reliance upon counsel's advice has been held to preclude a finding of bad faith where there is an absence of malice or ill-will"); *Advance Press & Litho*, 46 B.R. at 704 (bad faith not found where petition was filed after consultation with and upon advice of counsel).

WFC's attorneys, Kelley Drye & Warren (KDW), also adequately analyzed the affirmative defenses raised in both the Illinois and California actions. The merits of these answers had already been studied by KDW twice before, when the answers were received and in the course of preparing the motion to strike the defenses contained in the Illinois answer. After reasonable investigation, KDW also concluded that the answers and defenses to the WFC actions did not render WFC's claim subject to a *bona fide* dispute. *See West Side Community Hosp.*, 112 B.R. at 259 (although petitioning creditor's claim was found to be disputed, counsel had made a reasonable inquiry under Rule 9011).

(iii) The Midkiff Verifications

■■■ Bankruptcy Rule 1008 requires that all petitions be verified or contain an unsworn declaration. Midkiff, an officer of WFC, signed verifications of the involuntary petitions on March 5, prior to the completion of the final drafts of the petitions. She did this at counsel's request because she was traveling throughout the country in the month of March. Counsel advised her that the verifications would not be used without her prior approval. Throughout March, Midkiff reviewed four drafts of the petitions with the final draft being sent to her in San Jose on March 20, when she gave her approval for filing. Contrary to the assertions of the Alleged Debtors, I do not agree that the pre-signing of the verifications was in any way indicative of bad faith on the part of either WFC or BSI.

■■■ The single case cited for the Alleged Debtors' proposition that the pre-signed verifications constituted bad faith is inapposite. In *In re Keiler*, 14 F.Cas. 210; 18 N.B.R. 10 (S.D.N.Y.1878) the petitioning creditors signed verifications without having inspected the petitions which contained a false allegation that the requisite number of the alleged debtor's creditors had joined in the petition. As noted above, Midkiff reviewed the petitions, which met with her approval, prior to giving her consent to the use of her verifications.

Indeed, even should the WFC verification be viewed as defective, a defect regarding verification is "merely a procedural matter." *In re O'Brien*, 78 F.2d 715, 716 (2d Cir.1935). While there is a strict burden upon petitioning creditors to prove a basis for involuntary relief on the merits, the procedural requirements for initiating the involuntary proceeding are not as stringently enforced. Rather, absent a clear abuse of process, the court should address an involuntary petition on its merits. *In re Molen Drilling Co.*, 68 B.R. 840, 843 (Bankr.D.Mont.1987); *see also In re Country Woods Estates, Inc.*, 3 B.R. 721, 722 (E.D.N.Y.1980) (an irregular verification is generally not fatal to a bankruptcy proceeding but rather serves only to check the proceeding until a proper verification can be made).

(iv) WFC's Motives

■■■ The Alleged Debtors also attempted to show that the involuntary petitions were the intended culmination of an overall litigation strategy of WFC to coerce the Alleged Debtors into settling the debt owed to WFC. Whereas I agree with the Alleged Debtors that, if proven, this strategy would be relevant to my consideration of WFC's bad faith, WFC amply rebutted this argument by adequately explaining its purposes for filing the Illinois and California actions. Although the sale of the Cannery Park property was not expected to yield enough to satisfy the senior liens, WFC was advised that it was imperative that WFC file a judicial foreclosure action because a senior lender had already begun

non-judicial foreclosure. Under California law, had the senior lender conducted a sale of the property, WFC would have been forced to bid cash in the amount of the senior lienholder's final bid or face an entire loss. By contrast, in its own judicial foreclosure action, WFC could credit bid the amount of its debt and did not need to cash-out the senior lienholder. Because there would be a likely deficiency, WFC would also have to proceed by judicial foreclosure in order to preserve its rights against the general partners. Otherwise, their liability would be expunged by a non-judicial sale. A judicial foreclosure action was also a prerequisite to a motion to appoint a receiver, which WFC believed was merited because it believed that Cannery Park's rental income was being diverted to fund other projects.

The Illinois action, as discussed previously, was commenced to collect on the Alleged Debtors' guarantees of the Cannery Park loan. Rebutting the allegation that the action was instituted in Illinois venue simply to harass the guarantors, WFC explained that Illinois was chosen because one, the transaction had occurred there and was governed by Illinois law and, two, it appeared to be the only venue common to all four guarantors.

Rather than being a next step in some "litigation strategy," bankruptcy filings were utilized, on counsel's advice, to prevent the further dissipation of assets and provide for court-supervised administration of those assets. Any non-ordinary course business transactions, such as transfers to other creditors, that occurred within the gap period, could be set aside by a bankruptcy court. The bankruptcy filing would also necessitate the disclosure of the Alleged Debtors' financial affairs and allow creditors to determine the existence of the Alleged Debtors' assets. The argument advanced by the Alleged Debtors is diffi-

cult to credit for yet another reason. Why would one deliberately plan to commence an action on guarantees and then purposely, as a litigation tactic, cause the action to be automatically stayed and one's recovery to be inevitably relegated to a sharing with that of other unsecured creditors? The only sensible explanation is that offered by BSI and WFC; they were concerned with asset transfers and with obtaining accurate, reliable information.[5]

One page summaries of personal financial information which had been provided by the Alleged Debtors to WFC in January 1991 were wholly inadequate. The statements only provided book value for the Alleged Debtors' personal residences. Investments in MCG and other business ventures were noted with question marks. Additionally, months after a preliminary injunction had been issued in the California action, Midkiff, after reviewing the books and records of Cannery Park, was concerned that the Alleged Debtors, as the operators, had made improper transfers.

(v) The Investigation Into the Alleged Debts of Other Creditors

The Alleged Debtors also claimed in a post-trial memorandum that the investigation of the underlying allegations in the Reveley and Fusco petitions concerning debts owed to Nordbanken and The First New York Bank for Business was inadequate. This was not raised in the Alleged Debtors' case in chief (nor set forth in the pretrial order). Rather in cross-examination of WFC's witness, the witness, a Mr. Kiekhofer, a partner at KDW, was examined regarding these debts. Although Kiekhofer explained that he personally had not investigated these loans he was uncertain if either the Petitioning Creditors or anyone at his firm had researched them. The debts to both banks, however, had

---

5. The Alleged Debtors surmise that WFC filed suit followed by bankruptcy petitions because it was concerned that the Alleged Debtors had pleaded affirmative defenses which would defeat the Illinois action. The fear, according to the Alleged Debtors, was that the motion to strike the answer would be denied. This unproven speculation is not rational. If the Al-

leged Debtors, defenses were to survive the motion to strike, the action would nonetheless continue, presumably to trial, whereas if the defenses were to be upheld in the bankruptcy court, dismissal of the petitions would result with a possible imposition of costs and sanctions under section 303(i) of the Bankruptcy Code.

been listed on a debt matrix that was submitted to the banks by the Alleged Debtors. The Alleged Debtors' limited cross-examination of one witness who had not been present at many of the workout meetings is insufficient to show that the Petitioning Creditors failed to conduct a reasonable investigation.

## *Conclusion*

Based on all the evidence presented and for the reasons discussed above, I find that the petitions filed by BSI and WFC were not filed in bad faith under the standards of 11 U.S.C. § 303(i). SETTLE ORDER consistent with this decision.